Eduardo **TREJO**, Plaintiff-Appellee,

v.

Ivan **PEREZ**, Defendant-Appellant.

No. 81–2353
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1982.

Anthony C. McGettrick, Asst. City Atty., Laredo, Tex., for defendant-appellant.

Sharon Trigo, Laredo, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Ivan Perez, a police officer employed by the City of Laredo, Texas, appeals from a final judgment awarding money damages upon jury verdicts in a suit for false arrest brought by Eduardo Trejo under 42 U.S.C. § 1983. Perez argues that the trial court erred in not allowing the jury to find that he had probable cause to arrest Trejo for violating the Texas "Stop and Identify" statute, Tex. Penal Code Ann. § 38.02, and in not submitting his affirmative defense of good faith. Agreeing with Perez's first contention, we reverse and remand.

Early on the morning of January 23, 1979, Perez and a fellow officer arrived in separate patrol cars at 1103 Price Street in response to a request to investigate a family disturbance. Perez testified that when he arrived, he saw a parked car with a man standing by the driver's seat and a woman standing to the rear of the car. While the other officer, who had arrived simultaneously, approached the woman, Perez approached the man, who turned out to be Eduardo Trejo.

Perez testified that he asked Trejo what the problem was and Trejo replied, "There is not a fucking thing here. There is no problem." Perez by his account then asked, "Do you have any identification with you?" Trejo replied, "I don't have a fucking thing. I don't have shit,"[1] and continued to use vulgar language. He said, "We don't need you for a fucking thing here." At that point, Perez placed him under arrest.

After a struggle and with some help from the other officer, Perez took Trejo to his patrol car. There he told him that he was being arrested for disorderly conduct. Trejo was taken to the police station, booked, and taken to Webb County Jail.[2]

This suit, under 42 U.S.C. § 1983 against Perez, the Chief of Police of Laredo and the Mayor of Laredo for deprivation of civil rights, soon followed. Trejo alleged that Perez had arrested him without probable cause. The jury trial was held in two phases, the first phase inquiring into Perez's liability and the second inquiring into the liability of the other parties.

At the first trial, the district court denied Perez's request for an instruction that would allow the jury to find he had probable cause to arrest Trejo for violation of the Texas "Stop and Identify" statute, Tex. Penal Code Ann. § 38.02. First, the trial judge reasoned that because the statute was unconstitutional as applied to this case, it could not be a defense to an action for false arrest under 42 U.S.C. § 1983. Second, he noted that the offense was not the basis of the arrest. The jury found that Perez arrested Trejo without probable cause to believe that he had committed the offense of disorderly conduct and awarded damages of $2,000.

After the verdict and during the second phase of the trial, the trial court refused to allow Perez's claimed good faith "defense" on the grounds that while pleaded, no objection to its omission from the charge was made. At the end of the second trial, a directed verdict was granted in favor of the Mayor and the Chief of Police.

### Stop and Identify

Tex. Penal Code Ann. § 38.02 provides that "A person commits an offense if he intentionally refuses to report or gives a false report of his name and residence address to a peace officer who has lawfully stopped him and requested the information."

Perez was arrested in January 1979, six months before the Supreme Court decided *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), in which it reversed a conviction for violating § 38.02 on the grounds that the arresting officers lacked reasonable suspicion to make the initial stop. The statute was not held unconstitutional on its face until two years later. *Spring v. Caldwell,* 516 F.Supp. 1223 (S.D. Tex.1981), *rev'd on other grounds,* 692 F.2d 994 (5th Cir.1982). Thus, the unconstitutionality of the failure to identify statute was not clearly established at the time of Trejo's arrest.[3]

### The Uncertainty of the Law

The law of immunity for executive officials has recently been redefined by the Supreme Court in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court there clipped the subjective prong of the two-pronged inquiry previously followed.[4] The measure of offi-

1. The conversation was carried on mostly in Spanish.

2. Trejo's testimony differed sharply from that of Perez. He testified that he had been sitting in the car and that his mother had been getting in when they saw the officers get out of their patrol cars. Perez approached him and asked for his driver's license. Trejo replied, "I'm sorry I don't have it." Perez then demanded, "How the fuck do you not have it?" Trejo, who was insulted, answered, "I don't have any

fucking thing." Perez then immediately arrested him.

3. We express no opinion regarding the correctness of this decision. We cite the case only as an expression of the then state of the law.

4. *See Wood v. Strickland,* 420 U.S. 308, 320–321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Although *Harlow* involved the immunity of federal officials, the Court expressly stated that

cial conduct is now said to be objective. That is, the inquiry is what a reasonable officer knew or should have known. The Court effectively created a two level progressive inquiry:

(1) Was the law clearly established at the time? If the answer to this threshold question is no, the official is immune.

(2) If the answer is yes, the immunity defense ordinarily should fail unless the official claims extraordinary circumstances and can prove that he neither knew nor should have known that his acts invaded settled legal rights.[5]

Apart from the deletion of the subjective component, the first inquiry tracks the established principle that an officer is "excus[ed] ... from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as applied." *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). It follows that because it was not settled when the arrest was made that the failure to identify statute was unconstitutional, the trial court should not for that reason have declined to allow the jury to consider whether there was probable cause to arrest for its violation.

### Basis of the Arrest

■ Perez did not charge Trejo with violating § 38.02. As his own testimony made clear, Perez arrested Trejo for disorderly conduct. While it does not appear that Perez had failure to identify in mind when he made the arrest, it does not necessarily follow, however, that he could not justify its legality by reliance upon § 38.02. " '[W]hen a crime under which the arrest is made and a crime for which probable cause exists are in some fashion related, then there is no question but that there is a valid

arrest.' " *United States v. Atkinson,* 450 F.2d 835, 838 (5th Cir.1971), *cert. denied,* 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972) (quoting *Mills v. Wainwright,* 415 F.2d 787 (5th Cir.1969)). In *Atkinson* the court held that the validity of an arrest on a charge of false pretenses of a man who, using a fictitious name, had run up a sizable bill at a motel and had displayed improper license tags on his car could be sustained by a finding of probable cause to believe that the defendant had committed the misdemeanor of maintaining improper tags.

We turn to whether the charged offense of disorderly conduct and the charge of failure to identify were "related" within the meaning of *Atkinson* and to the fit between *Atkinson's* nexus and *Harlow's* test of objectivity. While it did not define the term "related," the *Atkinson* court warned that it would not "indulge in *ex post facto* extrapolations of all crimes that might have been charged on a given set of facts at the moment of arrest, nor [would it] look favorably upon arguments of the government doing the same. Such an exercise might permit an arrest that was a sham or fraud at the outset, really unrelated to the crime for which probable cause to arrest was actually present to be retroactively validated." *Id.* at 838. At the same time, we stated that we would not "force police officers to routinely charge every citizen taken into custody with every offense they thought he could be held for in order to increase the chances that at least one charge would survive the test for probable cause." *Id.*

■ Under *Atkinson,* charging an offense is not a prerequisite to its use in justification of a warrantless arrest. Indeed, the burden of the *Atkinson* opinion is to allow freedom of charge choice without opening the door to the "extrapolation" of offenses in an effort to justify a sham

---

the same immunity standard would apply to § 1983 actions against state officials. 102 S.Ct. at 2738–39 n. 30.

5. Although *Harlow* purports to "defin[e] the limits of qualified immunity essentially in objective terms," once an official's conduct has violated clearly established law, *Harlow* requires him to claim extraordinary circumstances and to prove that he neither knew nor should have known the relevant legal standard. Thus, subjectivity has not been eliminated altogether.

arrest. *Atkinson* would accomplish that task by its requirement that there be a nexus between the charged offense and the offense later used to support probable cause, a standard it left for case law development. Pointedly missing from the nexus test is any suggestion that an arresting officer must have in mind at the time of the arrest any offense later used to justify the arrest. That is, *Atkinson* did not require that the arresting officer have subjective awareness of any justifying charge when making the arrest. Instead, the *Atkinson* panel, while leaving its articulation for the future, opted for an objective standard for avoiding after the fact extrapolation. In doing so, it effectively anticipated *Harlow's* avoidance of subjective inquiry, thereby allowing congruent readings and a single inquiry to the tests of legality: whether a reasonable police officer would have had probable cause to believe an offense was being committed in his presence.

■ Given *Harlow,* we think this reading of *Atkinson* provides a workable legal standard. It obviates the need for a delicate subjective inquiry, likely to turn on little more than self-serving statements and speculation. Such an inquiry would offer little additional resistance to the risk of extrapolated offenses. It follows that *Atkinson's* teaching is best vindicated by asking only whether the conduct that served as the basis for the charge for which there was no probable cause could, in the eyes of a similarly situated reasonable officer, also have served as the basis for a charge for which there was probable cause. This reading is consistent with *United States v. Hathorn,* 451 F.2d 1337, 1341 (5th Cir.1971) (per curiam opinion on petition for rehearing), the only additional interpretation of *Atkinson.* There the court validated an arrest for driving under the influence because the defendant could have been arrested for being drunk in a public place. As the court noted, these were "sufficiently related offense[s]" within the meaning of *Atkinson. Id.* at 1342. In sum, whether a reasonable police officer would have believed an offense was being committed answers the question of whether the arrest was legal. Where noncharged offenses are relied upon to sustain an arrest, *Atkinson* also strains out extrapolated offenses by its requirement of objective reasonableness.

■ Applying our reading of *Atkinson,* we conclude that here disorderly conduct and failure to identify were sufficiently related that an objective police officer might have charged the offense of failure to identify. The conduct that gave rise to the arrest for disorderly conduct was Trejo's use of vulgar language in a public place. The conduct that might have permitted an arrest for violating § 38.02 was Trejo's use of vulgar language in response to a request for identification.[6] The jury should have been allowed to decide whether the sum of the facts here would have allowed a reasonable police officer to believe he had probable cause to arrest Trejo for failure to identify himself contrary to § 38.02 V.A.T.S.

### Good Faith Immunity Revisited

■ Because we reverse on the first ground, we need not reach Perez's contention that the omission from the jury charge of a good faith instruction was plain error.[7] We proceed, however, because the trial court will confront this confusing issue on remand. In *Douthit v. Jones,* 619 F.2d 527, 534 (5th Cir.1980), we stated that a police officer may defend a § 1983 action with proof that "he acted with a good faith belief that his actions were within his lawful authority," and "reasonable grounds existed for this belief." As defined in *Douthit,* the good faith defense had both subjective and objective components. Yet, as ap-

---

**6.** Trejo (according to both parties' testimony) was never asked to identify himself, but only to provide identification. We think this semantic difference should not have prevented Perez from getting to the jury on whether he had probable cause to arrest Trejo for a violation of § 38.02.

**7.** Because Perez did not timely object to the failure to instruct on good faith, our review would be limited to plain error.

plied to false arrest cases where the arrest was without a warrant, the "defense" was limited by the objective component of reasonableness. That objective measure seemed to differ little, if at all, from the inquiry into probable cause for arrest absent uncertainty as to the enforceability of the underlying statutory offense. If an officer had probable cause for an arrest, there were reasonable grounds to believe the actions were within his lawful authority; if there was no probable cause, there were no reasonable grounds. Illegality and lack of immunity coincided or nearly so.[8]

Admittedly, the difference between whether a reasonable police officer would have believed an offense was being committed in his presence and whether probable cause exists as viewed by a magistrate may have left a practical zone of protection for an illegal arrest in the sense that a magistrate and a civil jury may reach different answers to the question of probable cause. But the questions were the same. Because that difference did not inhere in the measure of probable cause for warrantless arrest cases, the good faith "defense" was largely an illusion in legal concept if not in practical fact unless there was uncertainty regarding the validity of the underlying offense. Even then the "defense" did not present a jury question beyond the existence of probable cause.

It must also be kept in mind that there is no legal uncertainty regarding the basic requirement that a misdemeanor arrest without a warrant cannot ordinarily be made unless the offense was committed in the presence of the arresting officer. Logi-

cally then, uncertainty may arise regarding either the existence of a legally effective proscription of the observed conduct or whether conduct, when summed, supports probable cause to believe an offense was committed. With either source of uncertainty, no jury question beyond inquiry into the existence of probable cause, measured objectively, is presented.

■ Since *Douthit* was decided, the Supreme Court decision of *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), has been described as having "... wrought a quiet revolution in the law of official immunities." *Saldana v. Garza,* 684 F.2d 1159 n. 15 (5th Cir.1982).[9] In *Saldana,* this court applied the *Harlow* qualified immunity standard to a false arrest case (involving a warrantless arrest). The panel there suggested that lack of immunity and illegality are not necessarily congruent, that an officer may be immune from damage liability even if probable cause for the arrest did not exist. *Id.* at 1164. Specifically, it suggested that in order to impose personal liability on an arresting officer, the plaintiff must not only show that the arrest was illegal, he must also show that it was "so illegal as to violate clearly established law." *Id.* at 1165. When *Saldana* is read against its facts, it is plain that we here do not reach a contrary conclusion.

■ *Saldana* was also concerned with the possibility that an officer might be held personally liable for making an arrest for conduct arguably protected by the First Amendment. *See* 684 F.2d at 1164. The

---

8. The *Douthit* court emphasized that it was following common law tort principles. "At common law a policeman against whom a false imprisonment action was alleged was entitled to immunity if he could demonstrate that he acted in good faith. The defendant police officer bore the burden of justifying the arrest that resulted in the false imprisonment charge by showing that he had reasonable grounds to believe that a crime had been committed." *Id.* at 533. In the common law of false arrest, courts frequently made explicit what is implicit in *Douthit,* namely that probable cause is the arresting officer's only defense in the context of a warrantless arrest. *See Director General of*

*Railroads v. Kastenbaum,* 263 U.S. 25, 27–28, 44 S.Ct. 52, 53, 68 L.Ed. 146 (1923); Restatement (Second) of Torts §§ 44, 118–121 (1965).

9. *Harlow* was specifically concerned with the immunity of presidential aides. Some of the policy considerations stressed by the Court, such as importance of shielding government policymaking, are peculiarly applicable to executive officials. Nevertheless, nothing in the Court's opinion indicates that *Harlow* would not apply to police officers on the beat. They certainly are "officials performing discretionary functions." 102 S.Ct. at 2738.

arresting officer in *Saldana* had a good faith defense to any uncertainty as to the constitutional application of the statute. *Saldana* did not specifically address the question of whether the good faith defense should be decided by the jury or the trial judge. The *Saldana* panel was presented only with the question of whether reversible error was presented by the "jury" resolving the question of uncertainty in the same way the trial judge should have. It perforce decided no more. Because the charge on remand is yet to be drawn, we do face that question. Questions regarding the legal uncertainty of the underlying offense are to be decided by the trial judge. If the trial judge decides that the legality of the underlying offense at the time of the arrest was not settled, as it should have here, the only jury issue would be framed as the objective immunity standard of *Harlow v. Fitzgerald.* It would not differ in application from the objective probable cause test for validity of a warrantless arrest.[10] The trial court here asked the jury:

> On the occasion in question, did Officer Perez have probable cause to believe that Eduardo Trejo had committed the offense of disorderly conduct? ... whether you think the officer out at the scene had probable cause, and the actions of the officer are to be measured by the test of what a reasonable person would have believed under those same circumstances ...

This was a proper inquiry despite an understandable assumption that a good faith instruction must be something more. At least since *Harlow,* the instruction was all that Perez was entitled to.[11]

■ In sum, had the trial court had the benefit, as do we, of *Harlow,* it would have examined the constitutionality of § 38.02. That examination ought to have produced the conclusion that the statute's validity was not so in doubt that the officer could not rely upon it. The proper inquiry then would be whether a reasonable officer under similar circumstances would have had probable cause to believe that Trejo had committed the offense of failure to identify. It follows then that the only "error" committed was in not submitting the failure to identify offense.

Because the offenses are intertwined, we reverse and remand for a new trial on all issues as to defendant Perez. The error not having affected the favorable verdicts of the remaining defendants, the judgment in their favor is affirmed.

AFFIRMED IN PART; REVERSED AND REMANDED FOR NEW TRIAL IN PART.

---

**10.** The Fourth Amendment rule on warrantless arrests *is* "clearly established law." If an arrest lacks probable cause for its support, it is, objectively speaking, in violation of clearly established law.

As noted above, even if an official's actions violated clearly established law, *Harlow* sustains the immunity defense if the official "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard ..." 102 S.Ct. at 2739. A police officer, however, is ordinarily charged to know the probable cause requirement. Whatever such extraordinary circumstances may be, their presence here has not been suggested nor do we find them. The first level of the inquiry is all that is needed here. At this second level of inquiry, the officer faces the additional burden of proving both subjective ignorance and its reasonableness. It

is in this context that an officer may be found not liable for an illegal arrest.

**11.** *Saldana* suggested that an arresting officer may have a good faith defense to an arrest made without probable cause. To the extent that such language suggests a defense that is more than the inquiry into whether probable cause existed, it can be true only when there is uncertainty as to whether the offense pointed to in support of probable cause existed. The *Saldana* panel stated:

> Plaintiff was not only required to show that this arrest was illegal; it was necessary that he show that the arrest was so illegal as to violate clearly established law ...

684 F.2d at 1165. Of course, if the underlying offense is clearly established, an arrest for its violation without probable cause is a violation of clearly established law. We read *Saldana* to say no more.