Peggy L. THORNE

v.

Major "A.B." JONES, et al.

Richard Eugene THORNE

v.

Major "A.B." JONES, et al.

Richard James THORNE

v.

Ross MAGGIO, et al.

Scott Allen THORNE

v.

Ross MAGGIO, et al.

Civ. A. Nos. 81–1033–A, 81–1043–A, 82–1140–A and 82–1141–A.

United States District Court, M.D. Louisiana.

April 4, 1984.

Stephen E. Everett, Alexandria, La., for plaintiffs.

Joseph Erwin Kopsa, J. Marvin Montgomery, Asst. Attys. Gen., Louisiana Dept. of Justice, Baton Rouge, La., for defendants.

JOHN V. PARKER, Chief Judge.

These consolidated actions present an array of claims against state prison authorities regarding strip searches of visitors to the Louisiana State Penitentiary at Angola. Two of these actions are brought by prison inmates and the other two by their mother and father respectively. The actions have been tried to a jury which found in favor of all plaintiffs and against some of the defendants. All defendants who have been found liable by the jury have filed a motion for judgment notwithstanding the verdict and alternatively a motion for a new trial. The motion has been orally argued and extensively briefed by both sides.

While there are many substantial issues in this case, it is important at the outset to point out that the validity of Angola's policies regarding the circumstances under which a visitor to the institution may be strip searched is *not* at issue. These complaints originally attacked the policy promulgated by the prison authorities and sought declaratory and injunctive relief against its application. Plaintiffs have, however, abandoned any attack upon the prison policy, per se, and these cases are restricted to examination of the reasonableness of the actions of the prison authorities in these particular cases only. All complaints allege deprivation of constitutional rights under color of state law in violation of 42 U.S.C. § 1983 and jurisdiction under 28 U.S.C. § 1343(3).

The Louisiana State Penitentiary at Angola is the largest maximum security prison in the nation. It houses nearly five thousand adult felons and consists of a main prison which holds some twenty-two hundred inmates and a series of outcamps, each housing one hundred to six hundred or seven hundred inmates, sprawled across some eighteen thousand acres of remote West Feliciana Parish hills. The smuggling of contraband into the prison, including money, weapons, alcohol, and narcotics is an ever present and serious security problem. Face to face or contact visits with inmates present an obvious opportunity for the smuggling of contraband. The contact visits serve a beneficial purpose both to the inmates themselves and to administration and security of the prison, and the prison authorities encourage such visits whenever possible. While facilities for contact visits do not exist at every camp within the prison, inmates in areas lacking such facilities are frequently transported by the

prison to other areas for that purpose. Inmates nominate visitors and only persons whose names appear upon an approved visitor list may visit an inmate. Each visitor is required to submit background information in writing to the prison authorities prior to visitor approval, and the form, signed by each visitor, declares prominently immediately above the signature line:

> I HEREBY AGREE TO A PERSONAL SEARCH BY SECURITY PERSONNEL OF THE LOUISIANA STATE PENITENTIARY WHILE ON PRISON GROUNDS.

Plaintiffs Richard Thorne (the father) and Peggy Thorne (the mother) each executed such a form.

A memorandum dated November 8, 1978 from legal counsel for the Department of Corrections addressed to all wardens and superintendents was introduced into evidence as Exhibit P–1. It provides:

> In order to preserve our rights to search visitors, vendors, and employees, signs must be posted at all entrances containing language generally conforming to the following:
>
>> "All persons entering upon these grounds are subject to routine searches of their person, (sic) property, or packages."
>
> Please note that unless there is a warrant, you cannot force a non-employee to submit to a search, but you can bar them from the institution. Strip and body searches should be conducted only after following the same procedures set forth for inmates in Dept.Reg. # 30–25.

In accordance with the quoted memorandum, prominent signs are posted at the main entrance to the prison so stating. All visitors to Angola are subjected to a "patdown" search upon arrival at the main gate; that is, a correctional officer of the same sex as the visitor moves his or her hands over the visitor's body including arms and legs, but there is no removal of clothing. All money and other contraband must be surrendered at the main gate. Visitors are transported by prison bus to the visiting facility at the particular camp

to be visited and are transported by the same bus back to the main gate upon conclusion of the visit.

The evidence establishes that all inmates are subjected to strip searches at the conclusion of every contact visit. "Strip search" is defined by departmental regulation Number 30–25 as:

> A *strip search* is a purely *visual* search of an inmate/student's body and does *not* involve the touching of the inmate/student by department employees. Limited manual opening of a body cavity, for example spreading the lips of the vagina or the cheeks of the buttocks, is permitted; however, the manual manipulation *must* be done by the inmate/student. The strip search does not involve probing inside the cavity.

Probing of body cavities is permitted only by qualified medical personnel.

Since this is a motion for judgment notwithstanding the verdict the court must examine all the evidence, drawing all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary verdict, the motion may be granted. If there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. *Burrage v. Harrell*, 537 F.2d 837, 839 (5th Cir.1976). Accordingly, the evidence in each case will be reviewed. These cases were consolidated for trial, and all the evidence was received at the same time so that there is no precise delineation as to the evidence offered in each case. The evidence will be summarized for each individual case.

## I

### THE FACTS

#### (Mrs. Peggy L. Thorne)

Mrs. Thorne has sued Warden Ross Maggio, Major Travis Jones, who was the com-

mander of Camp D where her son Scott Thorne was incarcerated, and Captain Alvin Ray Whistine, who was a shift commander at Camp D. Warden Maggio was made a defendant in all four cases and the jury returned a verdict in his favor in all four cases.[1] Plaintiffs have made no complaint about these verdicts in favor of the warden. The jury found in favor of Mrs. Thorne and against Major Jones and Captain Whistine in the amount of $15,000.

In late November 1981, Captain Whistine was informed confidentially by an inmate that another inmate was receiving contraband in legal mail sent from his attorney's office and that inmate Scott Thorne was receiving narcotics through the visiting room at Camp D on a regular basis, probably from his mother. Captain Whistine reported this tip to Warden Byargeon because Captain Jones was absent at the time. Warden Byargeon instructed Captain Whistine to put a mail watch on the mail of the one inmate and to notify all shifts that when Mrs. Thorne came to visit Scott Thorne, "that before she could visit she was to be requested that she be strip searched." Captain Whistine informed Major Jones of the warden's order and of the information that he had received from the confidential informant. A few days later (the evidence is not clear as to whether this was before or after Mrs. Thorne came to visit) the other inmate named by the confidential informant was caught receiving narcotics in mail ostensibly from his attorney. Major Jones, Captain Whistine and Warden Byargeon, among others, were all aware of that development.

Lieutenant Faren Rachal who was a corrections lieutenant at Camp D testified, when called as an adverse witness, that he received information at some unspecified time from an inmate that Scott Thorne was receiving contraband regularly through the visitors building. Later, when called on direct, he expanded his source to include two different inmate confidential informants. In any case he did not act immediately upon the information because it was his opinion that one can not always rely upon information received from inmates—they sometimes lie. Lieutenant Rachal did eventually report this information to Captain Clovis Tillary who was a corrections captain at Camp D. Captain Tillary testified that he tried to check out the tip but that he "never came up with anything concrete."

On December 3, 1981, Mrs. Thorne arrived at the front gate at Angola to visit her son Scott, as she had been doing regularly for several years. Each inmate is allowed two visits per month and a summary of visitors cards introduced by defendants shows that from January through November 1981 Mrs. Thorne made every authorized visit to Scott Thorne except three; she made a total of nineteen visits during that period of time. Mrs. Thorne produced her visitor's card and signed up to visit Scott Thorne, underwent the usual "pat-down" search and boarded the bus for Camp D. Personnel at the front gate notified Major Jones by telephone that Mrs. Thorne was on the way to Camp D and Major Jones contacted Warden Byargeon with that information. Warden Byargeon instructed Major Jones to strip search Mrs.

---

**1.** In their brief defendants argue that because Warden Maggio on the witness stand, "admitted against his own interest that he issued all the orders in these consolidated cases which his subordinates are required to carry out," the verdict in favor of the warden and against his subordinates is somehow inconsistent and the latter should be set aside. While it is correct that at the trial Warden Maggio magnanimously offered to assume responsibility for all actions taken in these cases by all correctional officers, the evidence indicates that Assistant Warden H.D. Byargeon, assistant warden for security, actually issued the order to search Mrs. Thorne,

the order to search Mr. Thorne, the order to deny Mrs. Thorne visiting privileges with her son Scott Thorne, and the order to deny Mrs. Thorne visiting privileges in toto. There is evidence which a reasonable jury could believe that Warden Maggio's information regarding these cases came mostly from his attendance at the trial and hearing the evidence and that, while he now approves of the actions taken by his staff, he was not personally involved at the time those actions were taken. Accordingly, had plaintiffs' moved for a judgment notwithstanding the verdict as to the warden, the court would have denied it.

Thorne before permitting her to visit. Major Jones arranged for female security guards to be available for that purpose and informed his staff of the warden's order. When Mrs. Thorne arrived at Camp D, she was informed by Captain Whistine that she would have to be strip searched before visiting her son. Mrs. Thorne emphatically refused to consent to such a search. This information was reported to Warden Byargeon who instructed Major Jones to personally escort her to the front gate, which he did.

On December 8, 1981, Warden Byargeon issued a directive, signed by him, which removed Mrs. Thorne from the approved visiting list of inmate Scott Thorne. This directive noted "This action is being taken due to an incident that occurred on December 3, 1981, in which Mrs. Thorne refused to be shaken down." (Prison slang for strip search) On December 11, 1981, Warden Byargeon issued an additional directive that Mrs. Thorne, "is to be removed from all visiting lists." From that date to the date of the jury's verdict, Mrs. Thorne was not allowed to visit either of her inmate sons.

(Mr. Richard Eugene Thorne)

Mr. Thorne has sued Major Jones, Captain Tillary, the corrections captain, Lieutenant Rachal, the corrections lieutenant, and Sergeant Ronald Lemoine, who was also a correctional officer assigned to Camp D. The jury returned a verdict in favor of Mr. Thorne and against Major Jones, Captain Tillary and Lieutenant Rachal in the amount of $10,000. The verdict was in favor of Warden Maggio and Sergeant Lemoine.

On December 4, 1981, the day following Mrs. Thorne's thwarted visit, Mr. Thorne arrived at the front gate to visit Scott Thorne. He underwent the "pat-down" search and boarded the bus for Camp D. Again Major Jones was notified that Mr. Thorne was on the way, and again Major Jones reported that information to Warden Byargeon who ordered Major Jones to conduct a strip search of Mr. Thorne. Upon arrival at Camp D Mr. Thorne was in-formed that he would not be permitted to visit Scott Thorne unless he was strip searched. Mr. Thorne agreed to the search and was taken into a private room where Captain Tillary, Lieutenant Rachal and Sergeant Lemoine conducted the search. Mr. Thorne removed all of his clothing, his naked body was visually observed, and his clothing was searched by the corrections officers. No contraband was found, and Mr. Thorne was allowed to visit. He has been permitted to visit both inmate sons without event since that time.

The visitors card introduced by the defendants shows that from January through November 1981, Mr. Thorne had visited Scott Thorne only four times, hardly a regular visitor.

Mr. Thorne is a retired (since November 1973) Air Force non-commissioned officer who is now employed by Dressler Industries in the Alexandria, Louisiana area. Mrs. Thorne is employed as a legal secretary and during her husband's military service was employed as a civilian employee at various military bases where Mr. Thorne was stationed. Both held military security clearances; neither has ever been convicted or even arrested for any criminal offense. No person associated with the penitentiary conducted any additional investigation into the allegations made by the inmate confidential informant, and no background investigation of Mr. and Mrs. Thorne was conducted prior to ordering the searches.

(Scott Thorne and Richard James Thorne)

The inmate sons sued Warden Maggio and Assistant Warden Byargeon. In each case the jury verdict was in favor of the plaintiff and against Warden Byargeon only, in the amount of $5,000.

The evidence offered by the defendants indicated that Scott Thorne was convicted of armed robbery and escape from DeQuincy (a first offender institution) and that he has been in Angola since April 1979. In late 1979, Scott Thorne received a disciplinary report involving contraband marijuana located in his cell.

Richard James Thorne was convicted of burglary, and while at DeQuincy he received a disciplinary report involving contraband drugs. He was transferred to Angola in December 1978, he was paroled, his parole was revoked, and he re-entered Angola in November 1981.

There is no evidence that either disciplinary report played any part in the orders regarding the strip searches or in deleting Mrs. Thorne from the visitors list.

After Mrs. Thorne was deleted from the visitors list, both sons have been permitted telephone calls several times a week and communication by mail with her.

## II

### THE LAW

These cases present clear clashes between the First Amendment's guarantee of freedom of individual association and the Fourth Amendment's right to be free of unreasonable searches with the vital interests of the prison authorities in internal security of the institution. It should be noted that the four cases involve three disparate claims: that of Mrs. Thorne of conditioning her visits with her sons upon an alleged unreasonable strip search, that of Mr. Thorne for being subjected to an alleged unreasonable strip search, and that of the inmate sons for the alleged unreasonable termination of their mother's visitation privileges with them.

Appropriate here are the comments of Justice Rehnquist in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979):

There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this complex arena. The deplorable conditions and Draconian restrictions of some of our Nation's prisons are too well known to require recounting here, and the federal courts rightly have condemned these sordid aspects of our prison systems. But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

99 S.Ct. at 1886.

In *Bell v. Wolfish*, the Court, assuming, but not deciding, that inmates of a penal institution retain some Fourth Amendment rights upon commitment, approved the practice of requiring all inmates, including pretrial detainees, to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution. The court specifically noted that the Fourth Amendment prohibits only unreasonable searches and commented:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intru-

sion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

99 S.Ct. at 1884.

In *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983), the Seventh Circuit commented that strip searches involving the visual inspection of the anal and genital areas are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission...." 723 F.2d at 1272. In other words, we deal here with the ultimate governmental intrusion. Balanced against the prison's imperative need for internal order and security, which is jeopardized by the smuggling of contraband, is the established principle that searches of the person are generally impermissible absent a search warrant, which issues only on probable cause. E.g., *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). While there is ample authority to support such searches of inmates of penal institutions for the purpose of maintaining the integrity and security of the institution, *Bell v. Wolfish, supra; Arruda v. Fair*, 710 F.2d 886 (1st Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983); *Daugherty v. Harris*, 476 F.2d 292 (10th Cir.1973), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Hodges v. Klein*, 412 F.Supp. 896 (D.N.J.1976); *Bijeol v. Benson*, 404 F.Supp. 595 (S.D.Ind.1975), an entirely different picture is presented when, as here, prison authorities impose such a personal intrusion upon free citizens who are merely visitors to the institution.

The defendants correctly point out that neither the Supreme Court nor the Fifth Circuit has yet spoken to this precise issue, although there is Fifth Circuit authority regarding body searches, particularly at border stations.

 The basic requirement of the Fourth Amendment is that any search must be reasonable. *See Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Not all searches must be based upon probable cause, *see Bell v. Wolfish, supra; United States v. DeGutierrez*, 667 F.2d 16 (5th Cir.1982), and the mere fact that a search is authorized upon the basis of an anonymous tip does not invalidate the search, see *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The legitimate governmental interest must be balanced against the competing privacy interest and, "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 99 S.Ct. at 1884.

The Fifth Circuit has concluded that strip searches by customs officials of persons entering the country at border points may be authorized upon a less than probable cause standard of "reasonable suspicion." *See United States v. Smith*, 557 F.2d 1206 (5th Cir.1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978); *United States v. Himmelwright*, 551 F.2d 991 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *Perel v. Vanderford*, 547 F.2d 278 (5th Cir.1977); *United States v. Love*, 413 F.Supp. 1122 (S.D.Tex.) *aff'd*, 538 F.2d 898 (5th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 628 (1976). In *United States v. Afanador*, 567 F.2d 1325 (5th Cir.1978), the court stipulated what is meant by a "reasonable suspicion" sufficient to authorize a strip search: "Lest there be any doubt, we state here that 'reasonable suspicion' must be specifically directed to the person to be searched." 567 F.2d at 1331.

Both sides in this case cite *Hunter v. Auger*, 672 F.2d 668 (8th Cir.1982), which is the only federal case which we have found dealing specifically with the standard to be applied for strip searching of visitors to penal institutions. *See also Commonwealth v. Lapia*, 311 Pa.Super. 264, 457 A.2d 877 (1983) (citing *Hunter v. Auger*). In *Hunter*, the Eighth Circuit, relying largely upon the "reasonable suspicion" standard adopted by the Fifth Circuit for border searches, concluded that this standard should be used to decide when prison visitors could be subjected to strip

searches. That court concluded that an anonymous uncorroborated tip was so lacking in reliability that it could not justify the degree of intrusion which is involved in a strip search of a visitor. Plaintiffs urge that the standard applied in *Hunter v. Auger* should be applied to this case, and the defendants argue that the Eighth Circuit is in error and that the decision should be ignored. Alternatively, the defendants argue that the circumstances of these cases meet the reasonable suspicion test.

It should be noted that the Eighth Circuit in *Hunter v. Auger* considered plaintiffs who actually were strip searched and other plaintiffs, like Mrs. Thorne, who declined to submit to the search and were denied visitation privileges. The court considered all of these claims as representing Fourth Amendment violations. With deference to the circuit court, it is difficult for me to see how a Fourth Amendment claim can arise in a situation where there has been no actual search. Claims of Mrs. Thorne, like the unsearched plaintiffs in *Hunter v. Auger*, are more properly considered as violations of First Amendment associational rights; that is to say, Mrs. Thorne's First Amendment associational rights with her sons were conditioned upon an unreasonable strip search, and her claim involves the First, not the Fourth, Amendment.

■ It cannot be disputed that a prison setting is unique. There are, nevertheless, some similarities in regard to persons entering the United States through a customs port of entry and visitors to penal institutions. Introduction of contraband into either has serious consequences, although the consequence in prison might be the more severe. A search of baggage, handbags and parcels at ports of entry or the front gate of a prison, routinely conducted upon all persons entering, is clearly reasonable and justified by the legitimate governmental interests involved; the invasion of privacy is relatively slight when balanced against the important mission of preventing smuggling of contraband. Considering the peculiar security problems of prisons, even the "pat-down" search of all visitors

to those institutions may well be squared with the Fourth Amendment. The ultimate intrusion, however, the strip search, cannot be conducted at will upon prison visitors, as the prison authorities themselves recognized in the 1978 memorandum quoted herein. While we are fully cognizant of the difficult and dangerous problems generated by introduction of contraband drugs into Angola, the prison officials have not demonstrated that their efforts at prevention and detention of contraband would be seriously hampered by first meeting a reasonable suspicion standard, "specifically directed to the person to be searched." *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir.1978). Where the general rule is that a search of the person may be conducted only with a warrant issued upon probable cause, *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Fourth Amendment must require at least reasonable suspicion for the warrantless strip searching of free people. I conclude that the Fifth Circuit reasonable suspicion standard for strip searches at ports of entry should also apply to visitors at penal institutions, such as Angola.

■ The defendants insist that the prominent signs at the entrance to the prison notifying everyone entering that they are subject to routine searches of their persons, property or packages (quoted above), together with the consent forms signed by Mr. Thorne and Mrs. Thorne, indicate that these visitors had consented to a strip search of their persons at any time the prison authorities decided to conduct such a search. The same proposition was rejected by the court in *Hunter v. Auger, supra,* and it clearly can not be sustained. Exhibit P-1, quoted above, itself indicates that these notices are not notice of strip searches because it specifically states, "Please note that unless there is a warrant, you can not force a non-employee to submit to a search, but you can bar them (sic) from the institution. Strip and body searches should be conducted only after following the same procedures set forth for inmates in Depart.Reg. #30–25." While Mr.

Thorne and Mrs. Thorne may have consented to the "pat-down" search at the front gate, which they do not challenge, neither has consented to a strip search, and the prison authorities, under the Fourth Amendment, cannot demand a strip search at will of all visitors. The prominent signs at the entrances and the consent forms signed by visitors clearly envision only the "pat-down" searches that are routinely conducted upon every visitor at the main gate.

### The Verdict in Mrs. Thorne's Case

The evidence in this case establishes unequivocably that the searches of Mr. and Mrs. Thorne were ordered by Warden Byargeon who did not testify at the trial. The evidence, taken fairly, indicates that Warden Byargeon immediately authorized such a search after receiving a report from Captain Whistine of an uncorroborated tip from a confidential inmate informant. There is evidence that the inmate's information was subsequently confirmed as to the inmate who received contraband through his legal mail. The evidence is also quite clear, however, that no attempt was made to investigate the background of these visitors prior to Mrs. Thorne's arrival at the prison, several days after the initial order to conduct the strip search was issued. Although the defendants produced evidence that both Scott Thorne and his brother, Richard James Thorne, had received disciplinary reports relative to contraband drugs, both of which were several years old, there is no evidence that this information was relied upon by Warden Byargeon in authorizing either strip search. Neither is there any evidence that the defendants who actually conducted and were involved in the strip search or attempted strip search were aware of that information. Accordingly, the evidence is not overwhelming that the order to conduct a strip search of Mrs. Thorne was predicated upon reasonable suspicion. On the contrary, a reasonable jury could conclude from the evidence that Warden Byargeon's order was not based upon reasonable suspicion.

Following oral argument and post-argument brief, counsel for defendants has called attention to an as yet unpublished state court decision, *State v. Kleinpeter*, 449 So.2d 1043 (La.App. 1st Cir.1984). In that case, the prison authorities at Angola received information that an inmate was to receive drugs from a visitor on August 7, 1981. When Kleinpeter, the visitor, arrived, prison officials asked that she submit to a strip search. When she refused, they detained her while they submitted affidavits to an impartial magistrate who authorized the issuance of a search warrant. The state court concluded that there was probable cause for the warrant based upon evidence presented to the judge that on four prior occasions the inmate appeared to be intoxicated following visits from Kleinpeter, that Kleinpeter is from the New Orleans area and the inmate had received a fictitious letter post-marked in New Orleans which contained hashish, that the unnamed tipster claimed to have overheard a conversation of the inmate himself, that the informant had given reliable information in the past, and that Kleinpeter was the only visitor requesting to see the inmate on August 7, 1981. As noted, the court concluded that the search warrant was based upon probable cause and that Kleinpeter was properly convicted for attempting to smuggle the contraband which was found upon her body. The case does not help the cause of the defendants because it shows that, as to at least one visitor, the prison authorities had the time and facilities to submit a request for and to obtain a search warrant based upon probable cause. I do not suggest that the *Kleinpeter* case indicates that warrants for the strip searching of visitors should be required in all cases, but clearly the lesser standard of reasonable suspicion, applied to Mrs. Thorne, is proper.

■ It is significant, however, that Mrs. Thorne was not actually searched. Accordingly, she has suffered no Fourth Amendment violation. Her claim is a First Amendment associational right. Her visitation privileges with her two inmate sons were predicated upon an unreasonable search and seizure. The evidence is clear

that Warden Byargeon removed Mrs. Thorne from the visitors list because she refused to agree to be strip searched at will by the prison authorities. The Fourth Amendment does not allow the prison authorities to demand such a search, and the First Amendment does not allow them to condition her visitation upon such a search. Clearly the prison authorities have the duty and responsibility of maintaining order and of prohibiting the smuggling of drugs and other contraband into the institution, but they may not at will conduct such intrusive searches upon the bodies of visitors to the institution nor condition visitation upon consent to such searches. A reasonable jury could well conclude that Mrs. Thorne's First Amendment rights have been violated. Those rights were most significantly violated by Warden Byargeon when he issued the orders terminating her visitation, not only with her son Scott, about whom there was at least a suspicion, but also with her son Richard James, whose name was never mentioned in connection with this incident. Warden Byargeon was not named as a defendant in Mrs. Thorne's suit, and there is no evidence indicating that Major Jones or Captain Whistine had any participation in the issuance of the directives several days later that terminated Mrs. Thorne's visitation. Major Jones and Captain Whistine simply asked her whether she would consent to a search, and, upon her refusal, Major Jones escorted her from the institution. While Major Jones and Captain Whistine cannot be held for Warden Byargeon's subsequent actions, there is evidence that both participated in the violation of her First Amendment rights on the date of her visit. Both were aware of the information upon which Warden Byargeon based his order to strip search Mrs. Thorne. Both were aware, or should have been aware, that the prominent posters and signed consent forms did not extend to strip searching visitors. As reasonable correctional officers both should have known that visitation rights cannot be conditioned upon the ultimate intrusion of a strip search where there is no reasonable suspicion directed to the individual to be searched.

Defendants have pleaded the qualified immunity defense. For reasons stated under the discussion of Mr. Thorne's case, *infra*, defendants have not established that defense. Accordingly, there can be no judgment notwithstanding the verdict in this case.

■ Defendants have alternatively moved for a new trial under rule 59 of the Federal Rules of Civil Procedure. One of the grounds stated in the motion is that the verdict is against the weight of the evidence. The granting of a new trial, unlike judgment notwithstanding the verdict, lies within the sound discretion of the court. *Globe Liquor Co. v. San Roman*, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948); *Del Rio Distributing, Inc. v. Adolph Coors Co.*, 589 F.2d 176 (5th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). The weight of the evidence here is against the $15,000 verdict in favor of Mrs. Thorne. Most of her damage incurred from termination, on a quasi-permanent basis, of her visitation with her sons. The actions of defendants Jones and Whistine simply could not have inflicted $15,000 in damages. Although not controlling in determining whether the jury verdict is excessive, it is of interest that in *Hunter v. Auger*, 672 F.2d 668 (8th Cir.1982), the court approved only nominal awards in favor of visitors who declined to submit to the strip search and were escorted from the prison. Evidence of Warden Byargeon's termination of visitation was relevant to determination of liability in the actions of the sons because Warden Byargeon is a defendant in those actions, and a $15,000 verdict in favor of Mrs. Thorne against him would certainly be within the wide range accorded juries in assessing such intangible damages. It is clear to the court that the jury here awarded Mrs. Thorne the full damages she would have been entitled to receive had Warden Byargeon been a party defendant. For whatever reasons, plaintiff chose not to make him a party in this action. The limited activi-

ties of Major Jones and Captain Whistine, according the jury the widest latitude, could not in good conscience have caused damage exceeding $5,000. Accordingly, the motion for new trial will be granted, limited to the amount of damages only, unless plaintiff consents to a remittitur in the amount of $10,000.

### The Verdict in Mr. Thorne's Case

■■■■ The case of Mr. Thorne is different because he was actually searched. His testimony was quite clear that the only reason he permitted the search was that it was made plain to him that he would not be permitted to visit his son unless he allowed it. "Consent" under compulsion is no consent at all, and the state authorities do not seriously argue that Mr. Thorne consented to the search on the day in question. It is significant that Mr. Thorne's name was never mentioned, even in the information from the confidential informant. The evidence offered by the defendants themselves establishes that Mr. Thorne was not a regular visitor, having visited only four times during all of 1981. It will be recalled that the information supplied was that Scott Thorne was receiving drugs regularly through the visiting room, probably from his mother. Since Mr. Thorne was not a regular visitor (his last preceding visit was September 5, 1981), a reasonable jury could conclude that the prison authorities had no information which focused specific suspicion upon him. Reasonable suspicion must be specifically directed to the person to be searched, and the Fourth Amendment does not permit any automatic or casual transfer of suspicion. *United States v. Afanador,* 567 F.2d 1325, 1331 (5th Cir.1978). Under the evidence presented there was no probable cause, no reasonable suspicion, no reason at all to suspect Mr. Thorne of attempting to smuggle contraband into the prison. Accordingly, a reasonable jury could easily conclude that Mr. Thorne's Fourth Amendment rights were violated by the persons who conducted the search.

As in Mrs. Thorne's case, Warden Byargeon ordered the search but he was not made a party defendant in Mr. Thorne's suit. The individuals conducting the search, Major Jones, Captain Tillary, and Lieutenant Rachel against whom the jury returned a verdict have also pleaded good faith immunity. All argue that *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982), if that standard is applicable, was not decided until after the search was conducted and that as reasonable correctional officers they should not be held to knowledge that a standard of reasonable suspicion was required for strip searching visitors.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982), the Court held that public officials are shielded from liability for civil damages under the good faith immunity defense only insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In *Trejo v. Perez,* 693 F.2d 482 (5th Cir.1982), the Fifth Circuit applied a two-step analysis to the qualified immunity defense. *See also Stokes v. Delcambre,* 710 F.2d 1120 (5th Cir.1983). The initial question required by the court in *Trejo* is: "Was the law clearly established at the time? If the answer to this threshold question is no, the official is immune." *Id.* at 485. The 1982 Eighth Circuit case does not represent some new, startling or different doctrine. The Fourth Amendment to the Constitution became effective November 3, 1791. The jurisprudence has been consistent that a search of the person ordinarily requires a search warrant based upon probable cause, *see, e.g., New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), and that a strip search based upon a standard less than probable cause could be undertaken only under the most unusual and compelling circumstances. *See, e.g., United States v. Himmelwright,* 551 F.2d 991 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

■■■■ The second question required by the court in *Trejo* is: "If the answer [to No. 1] is yes, the immunity defense ordinarily should fail unless the official claims

extraordinary circumstances and can prove he neither knew nor should have known that his acts invaded settled legal rights." 693 F.2d at 485. The defendants have claimed no extraordinary circumstances. In this very case, the attorney for the Department of Corrections advised all wardens and superintendents in 1978 (see Ex. P–1 quoted above) that something more was required for strip searches of visitors than the prominent signs at the front gate of the prison. I conclude that a reasonable correctional officer at the Louisiana State Penitentiary in November 1981, applying the objective test mandated by *Harlow v. Fitzgerald, supra,* ought to have been aware that a strip search of a visitor requires that at least some suspicion exist directed toward the visitor personally. While such an officer might not be fully aware that a "reasonable suspicion" versus some lesser standard is required, every reasonable officer should have been aware that clearly established constitutional rights were violated when there was no reason to suspect that individual was smuggling contraband and when the search was merely at the will of the prison authorities.

 Defendant's argument that they were merely following orders is not persuasive either. While it appears that the question of whether a police officer is liable for arresting a citizen when following the direct orders of his superior is not clear and settled, *Vela v. White,* 703 F.2d 147 (5th Cir.1983) (comparing *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963) with *Anderson v. Nosser,* 456 F.2d 835 (5th Cir. 1972) (en banc)), the evidence in this case supports the conclusion that the three officers knew or should have known that the strip search of Mr. Thorne ordered by Warden Byargeon violated his constitutional rights. The evidence also supports that conclusion in Mrs. Thorne's case and further supports the conclusions that if the ordered strip search was unreasonable, then escorting her from the prison because of her refusal was also unreasonable. A subordinate at a penal institution ordinarily is in no position to question the order of his

superior; indeed, in some instances the safety of the subordinate and others may depend on instant obedience to orders. No such extreme or hazardous situation existed here, however, and the subordinates could at least have questioned the superior's order. A subordinate who without question executes the unconstitutional order of his superior does so at his peril. *See Zarcone v. Perry,* 572 F.2d 52 (2d Cir. 1978). Under these circumstances, where a reasonable corrections officer ought to have known that depriving Mrs. Thorne of visitation because of her refusal to be strip searched was a violation of her First Amendment rights and that the strip search of Mr. Thorne was a violation of his Fourth Amendment rights, the defense of "following orders" is not appropriate. Consequently, the defendants have not established the qualified immunity defense in either case. The verdict in favor of Mr. Thorne cannot be the subject of judgment notwithstanding the verdict.

### The Sons' Verdicts

 As to the Thorne brothers, yet another situation exists. They are, of course, convicted felons, and their rights are substantially curtailed. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). It is clear that for security reasons the penal authorities may even prohibit all contact visits by inmates. *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754 (3d Cir.1979). The state here argues that termination of contact visits was proper because the inmates were permitted to communicate with their mother by telephone and by mail. That argument was made to the jury and rejected by the jury because the prison authorities presented no evidence justifying the termination of contact visits. The prison authorities make these two cases more difficult by insisting that the termination of visitation was predicated not upon any conduct or activities of either of the inmate sons, but solely upon Mrs. Thorne's refusal to be strip searched. The evidence is clear that contact visits with inmates at Angola are the general

rule and that they are encouraged by the prison administration for the benefit of both the inmate and the institution itself. While I fully concur that inmates have no constitutional right, per se, to contact visits, *Inmates of Allegheny County Jail v. Pierce, supra,* the prison authorities ought to have *some justification* for termination of visits in a particular case. Here there has been no evidence presented of any misconduct involving Richard James Thorne and no confirmation of the allegations made about Scott Thorne. Had the prison authorities produced any evidence indicating that either of the inmates had violated any prison rule or regulation or otherwise been guilty of any misconduct, then the termination of their visitation privileges could easily be justified. No such evidence was presented to the jury, however, and a reasonable jury could well conclude that the associational rights of the two inmates were also violated by unreasonably terminating Mrs. Thorne's visitation. The verdicts against Warden Byargeon who ordered termination of visitation must stand.

Applying the standard for motions for judgment notwithstanding the verdict of *Burrage v. Harrell,* 537 F.2d 837, 839 (5th Cir.1976), I conclude that the evidence heard by the jury was not overwhelmingly in favor of defendants. Accordingly, the motion for judgment notwithstanding the verdict must be denied in each case.

As to the motions for new trial, the court can find no reason to grant a new trial in any case except that of Mrs. Thorne, limited to the issue of amount of damages, should she decline the remittitur in the amount of $10,000. In each of the other cases the motion for new trial is hereby DENIED.

## INJUNCTIVE RELIEF

Plaintiffs originally prayed for injunctive relief, and following the verdict the court directed both sides to brief this issue. Plaintiffs have suggested injunctive relief equivalent to that which would have been appropriate had the state policies on strip searches been considered and found want-

ing. As noted earlier, all such claims have been abandoned. Under these circumstances the equitable remedy of injunction is not appropriate.

## EPILOGUE

Contrary to counsel's cataclysmic predictions in brief, the walls of the state prison will not come tumbling down as a result of confirming the jury's verdicts in this case. Prison officials need not cower in fear and trembling that they are prohibited from taking all necessary measures to exclude contraband. All that prison officials must do is to observe the reasonable rights of citizens who visit the institution. The notion that any visitor may be strip searched at random, simply because he visits a maximum security prison will not wash, and as I have pointed out Exhibit P–1 demonstrates that the prison authorities did not think so, even prior to this litigation. The *Kleinpeter* case, submitted by defendants, shows that in a proper case the prison authorities may obtain a warrant to strip search a visitor and may effectively prosecute the visitor who attempts to smuggle contraband. While it cannot be disputed that incarceration automatically results in diminished constitutional protections, it is also indisputable that a citizen who visits a prison retains all of his constitutional protections—he does not acquire the status of inmate simply by visiting an inmate. In a country where since 1791 the law has proclaimed, "The right of the people to be secure in their persons ..., against unreasonable searches and seizures, shall not be violated, ..." no undue impedement is imposed upon the prison authorities by demanding that before they subject a citizen visitor to the ultimate intrusion of a strip search of his body, the authorities be in possession of specific facts pointing to the individual to be searched, facts which constitute reasonable suspicion that the individual may be in possession of contraband. In this court's view the Fourth Amendment will countenance nothing less.