Ruth BLACKBURN, Plaintiff, Appellee,

v.

Linwood SNOW, et al.,
Defendants, Appellants,

No. 84-1736.

United States Court of Appeals,
First Circuit.

Argued Feb. 5, 1985.

Decided Aug. 22, 1985.

Rehearing and Rehearing En Banc
Denied Sept. 20, 1985.

Paul J. Sullivan and Francis J. O'Rourke, Boston, Mass., for defendants, appellants.

Jeffrey W. Kobrick, Boston, Mass., with whom Charles R. Capace, Boston, Mass., was on brief, for plaintiff, appellee.

Before BREYER and ALDRICH, Circuit Judges, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

At issue in this case is whether the federal Constitution permits a correctional institution to require that all men, women and children wishing to visit inmates at the institution submit to a strip search before doing so. Ruth Blackburn, the plaintiff-appellee in this case, was required to submit to such a search on three occasions in 1977 when she sought to visit her brother at the Plymouth County Jail. The searches were conducted pursuant to an order issued by then-County Sheriff Linwood Snow, one of the defendant-appellants here, which mandated that all visitors be strip searched, whether or not there was any cause to believe they were carrying contraband. Blackburn subsequently challenged the constitutionality of the blanket strip search policy. After the district court entered a temporary restraining order, Sheriff Snow agreed to discontinue the policy permanently. A bench trial on Blackburn's damages claim followed. Ruling that the strip search policy violated the First and Fourth Amendments, the district court entered judgment against Snow and defendant-appellant Plymouth County, and awarded Blackburn $177,040 in compensatory damages, as well as prejudgment interest on that sum. The Sheriff and the County now appeal from that judgment, assigning a host of factual and legal errors. Because we find that the strip searches violated Blackburn's Fourth Amendment rights, we affirm as to liability and compensatory damages, but vacate and remand for specific findings as to whether an award of prejudgment interest was necessary.

BACKGROUND

Ruth Blackburn's brother, Richard McCarthy, was transferred to the Plymouth County Jail in January, 1977. Prior to April, 1977, when Sheriff Snow issued the order requiring all visitors to be strip searched, Blackburn had, without incident, visited her brother on a weekly basis. She had been virtually his only visitor. During the period from January through March, Blackburn had been fully subject to the security measures in effect before the advent of the strip search rule. These measures included "pat frisks" and metal detector searches, both of which were performed while the visitor was fully clothed. In addition, visitors were required to leave all personal possessions and money with

---

* Of the District of Rhode Island, sitting by designation.

officials before entering the visiting area. Once inside the visiting room, separate seating for inmates and visitors was provided. A television camera monitored ninety percent of the visiting area and two roving corrections officials were present in the room. Finally, inmates were strip searched following each visit.

In April, when Blackburn arrived at the Jail, she noticed a new sign announcing that all visitors would be "skin searched." She took the term "skin search" to mean the "pat frisk" to which she had been routinely subject.[1] When she reached the front of the line, however, it became clear that she would have to undress and be strip searched in order to visit her brother. She was taken to a small room, where she removed her clothing. During the search that ensued, a female matron inspected Blackburn by, among other things, examining her armpits, lifting her breasts and crouching to view her anus. Blackburn testified that she was sweating and shaking, and felt nervous and humiliated during the procedure.

When Blackburn next returned to the Jail, she was again required to submit to a strip search—this time performed by a different matron. Responding to Blackburn's inquiry whether this search was "really necessary," the matron stated that it was, if Blackburn wished to see her brother. This second strip search took a longer period of time and Blackburn, in her testimony, indicated that she thought this matron "seemed to be enjoying what she was doing." The matron lifted Blackburn's breasts twice and crouched to spread Blackburn's buttocks with her hands, in order to examine her anus and crotch area with a flashlight. Blackburn testified that she was sweating and shaking more severely this time, had trouble standing, and left sweatprints on the wall she was made to lean against while "spread eagled."

Following this visit, Blackburn, and a younger brother who accompanied her that day, were leaving the Jail by cutting across a lawn that connected to the road. They were stopped by Sheriff Snow, who admonished them that this lawn was off limits to visitors because of the danger that visitors might use it to make a contraband "drop" for inmates. Following a conversation in which Blackburn protested that she was carrying no contraband, the Sheriff told her that he didn't "want to see her face around here anymore."

The last time Blackburn went to the Jail, she was required once more to submit to a strip search. After the completion of the search, however, she was informed that she had been barred from visiting the Jail. She was not told why. The Sheriff later testified that he had given this order as a result of the incident on the lawn—although he had not so notified Blackburn—because he believed that the plaintiff had made an obscene gesture towards him at the close of their conversation.[2] Shortly thereafter, Blackburn brought suit challenging the legality of the visitor strip search policy.

It was undisputed at trial both that the above-recounted searches had taken place, and that Blackburn, herself, had never been suspected of attempting to secretly bring contraband into the institution. Rather, the Sheriff emphatically stated that Blackburn was strip searched as a matter of routine procedure which, under the terms of his order, applied equally to all visitors—including infants and children. Indeed, the Sheriff believed that it was in

---

1. Blackburn also testified that she signed a visitor slip each time she visited the Jail, in which she gave authorization to a search of her person and property. She testified that, as with the "skin search" sign, she assumed this search of her person referred to the routine pat frisks.

2. The Sheriff testified that he barred Blackburn from visiting because of this gesture, not because he thought she had, in fact, meant to drop

contraband on the lawn. The trial judge made no finding that Blackburn made an obscene gesture. Instead, the court believed that the Sheriff made his decision based on his conversation with Blackburn on the lawn. The court ruled, however, that any claim for damages resulting from this incident was not properly before it. *Cole v. Snow*, 586 F.Supp. 655, 659 & n. 9 (D.Mass.1984).

the very uniformity of the strip search policy in which its fairness inhered; by strip searching all visitors, without regard to any individualized suspicion, the Sheriff felt he could avoid the perception of unfairness, yet effectively check the flow of contraband into the Jail. The Sheriff testified that he had originally issued the visitor strip search order in 1974, but that he learned in April, 1977 that it was not being followed. He discovered this after investigating an incident in which an inmate who obtained the drug Valium had attempted to assault an officer. Although the Sheriff testified that the Valium involved in that incident had never been conclusively linked to any visitor, and that between 1974–1977 there had been only five incidents involving visitors and contraband, he nonetheless felt that the incident underscored the grave danger posed by drugs in the institution. Accordingly, pursuant to his statutory authority as Master of the Jail to fashion policies regarding visitation, he reissued his 1974 strip search order in April, 1977. While, by his own testimony, the Sheriff indicated that he had never heard of another penal institution that strip searched every visitor—a view shared by plaintiff's prison expert, Joseph Cannon—the Sheriff nonetheless believed that he was within his rights to issue the order.

The district court granted a temporary restraining order against the rule in May, 1977, and in January, 1978, the Sheriff agreed permanently to abandon the practice of strip searching all visitors. Nine days of bench trial on Blackburn's claim for damages followed. In an opinion dated May 9, 1984, 586 F.Supp. 655 (D.Mass. 1984), and a supplemental opinion dated August 7, 1984, 588 F.Supp. 1386 (D.Mass. 1984), the district court ruled that the strip search policy violated the First and Fourth Amendments. The court believed that Blackburn had a First Amendment right to a visit (though not necessarily a contact visit) with her brother and that the search rule was an "unnecessarily broad," 586 F.Supp. at 660, restriction on the exercise of that right. The court also concluded that, because of the highly intrusive nature of the strip searches at issue—body cavity searches which involved not only visual inspection, but manipulation of breasts and buttocks, as well[3]—a blanket search rule could not satisfy the Fourth Amendment's reasonableness requirement.

After rejecting the Sheriff's qualified immunity defense and the County's argument that it was insufficiently involved in the administration of the Jail to have been found liable for the strip search policy, the court awarded Blackburn $177,040 in compensatory damages. The damages were based on the court's factual findings that the searches had directly caused Blackburn extensive physical and psychological harm. Because the court also found that an award of prejudgment interest was necessary to compensate Blackburn fully for this harm, it made such an award, which amounted to $151,080. 588 F.Supp. 1386, 1389.

On appeal, Snow and the County press four claims. First, appellants argue that neither the First nor Fourth Amendment prohibits adoption of the strip search policy at issue here. Second, the Sheriff argues that he was entitled to qualified immunity from liability. Third, the County argues that it may not properly be held liable for the Sheriff's actions. Fourth, both appellants challenge the award of compensatory damages as excessive and the award of prejudgment interest as inappropriate under the circumstances.

---

**3.** A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities. *See Security & Law Enforcement Employees v. Carey,* 737 F.2d 187, 192 (2d Cir. 1984).

Three separate searches were conducted of Blackburn. The district court heard evidence on only the first two. According to the Court's findings, the first search was a "visual body cavity search," which involved manual examination of her breasts, armpits, throat and ears, but not her body cavities. The second search, however, extended to a manual spread of Blackburn's buttocks.

## DISCUSSION

### The Constitutionality of the Strip Search Policy

 Any inquiry into the constitutionality of security measures employed in a penal institution must begin with the premise that "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (citations omitted). Because the prison is so peculiarly a "volatile 'community,' " *Hudson v. Palmer*, —— U.S. ——, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984), the preservation of internal security "is 'central to all other corrections goals,' " *id.*, 104 S.Ct. at 3201 (quoting *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). At the same time, "prisons are not beyond the reach of the Constitution. No 'iron curtain' separates one from the other," *Block v. Rutherford*, —— U.S. ——, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) and "[t]he fact that particular measures advance prison security ... does not make them *ipso facto* constitutional," *id.*, 104 S.Ct. at 3236 (Blackmun, J., concurring). Our task in prison cases is, thus, a delicate one: neither may we substitute our own judgment about the wisdom of security measures for those of experienced prison personnel, nor may we abdicate our responsibility to ensure that the limits imposed by the Constitution are not ignored in the name of "necessity." But, in our view, this case poses a challenge less difficult than many in this area, for we conclude that a rule requiring *all* prison visitors to submit to a body cavity strip search, without *any* predicate requirement of individualized suspicion or showing of special and highly unusual institutional need, cannot satisfy the Fourth Amendment. Because we view the search and seizure issue as determinative, we do not reach the First Amendment question.

 The fundamental purpose of the Fourth Amendment prohibition on unreasonable searches and seizures " 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' " *New Jersey v. T.L.O.*, —— U.S. ——, 105 S.Ct. 733, 736, 740, 83 L.Ed.2d 720 (1985) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)). As such, although most commonly invoked in the law enforcement setting, the protections of the Amendment apply fully to all forms of "governmental action," *id.*, 105 S.Ct. at 740, so long as " 'the person invoking [Fourth Amendment] protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action,' " *Hudson v. Palmer, supra*, 104 S.Ct. at 3199 (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)).

While appellants concede, as they must, that the Fourth Amendment applies to the challenged actions here, they argue first that Blackburn retained no legitimate expectation of privacy when she entered the Jail. Like appellants' claim that Blackburn consented to the searches—which we discuss fully later—this argument presupposes that one who decides to enter a controlled environment must do so on the terms prescribed for entry by those in charge of that environment. But the two arguments are distinct, in that the expectation of privacy inquiry goes to whether Blackburn was entitled to the protections of the Fourth Amendment in the first instance, while the consent question goes to whether Blackburn has waived constitutional protection to which she is otherwise entitled.

 Appellants base their claim that Blackburn had no legitimate privacy expectation on the fact that, at least after the first strip search, if not before, she knew that she would be subject to such a search if she went to the prison. In so framing their claim, however, appellants misapprehend the relevant doctrine. As the Su-

preme Court has recently noted, the "controlling" inquiry where an expectation of privacy is challenged is whether the expectation is one " 'society is prepared to recognize as "reasonable." ' " *Hudson v. Palmer, supra,* 104 S.Ct. at 3199 & n. 7 (quoting in part *Katz v. United States,* 389 U.S. 347, 360, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) ). That appellants may have put Blackburn on "notice" that she would be subject to an examination of her body cavities before entering the Jail cannot determine the "controlling" question: namely, whether her expectation that she would be free of such searches was one society would call reasonable.[4] And we think it is clear that society is "prepared to recognize" that free citizens entering a prison, as visitors, retain a legitimate expectation of privacy, albeit one diminished by the exigencies of prison security. To be sure, those visiting a prison cannot credibly claim to carry with them the full panoply of rights they normally enjoy. But neither may they constitutionally be made to suffer a wholesale loss of rights—nor even one commensurate with that suffered by inmates. For as the Supreme Court has recently observed, the "harsh facts of criminal conviction and incarceration," *New Jersey v. T.L.O., supra,* 105 S.Ct. at 741, separate free citizens from those confined to penal institutions. In the *T.L.O.* case, the Court relied on this distinction to hold that school children retain a legitimate (though reduced) expectation of privacy at school, even while prisoners, under the Court's recent decision in *Hudson v. Palmer, supra,* retain no such expectation in their prison cells. In *Hudson* itself, the Court explained that "imprisonment carries with it the circumscription or loss of many significant rights ... [and] in some cases the complete withdrawal of certain rights are 'justified by the considerations underlying our penal system.' " *Id.,* 104 S.Ct. at 3199 (citations omitted) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948) ). Thus, *Hudson* did not suggest, and we do not find, that the security needs of a prison can, *standing alone,* properly justify the "complete withdrawal" of Fourth Amendment rights from *all* who enter the institution (except perhaps in a highly unusual circumstance such as a prison riot). Because of the "harsh facts" that separate the visited from the visitor here, we conclude that Blackburn was entitled to expect at least some measure of personal privacy while at the Jail. In so holding, we are in accord with all the published federal court opinions of which we are aware that involve Fourth Amendment challenges by prison visitors. *See Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982); *Thorne v. Maggio,* 585 F.Supp. 910 (M.D.La.1984); *Black v. Amico,* 387 F.Supp. 88 (W.D.N.Y.1974); *cf. Security & Law Enforcement Employees v. Carey,* 737 F.2d 187 (2d Cir.1984) (prison employees retain limited expectation of privacy).

■■■ The degree of privacy Blackburn retained upon entering the Jail is relevant to the next question: whether the strip searches were "reasonable" within the meaning of the Fourth Amendment. Whether a particular government search is reasonable "depends on the context within which a search takes place." *New Jersey v. T.L.O., supra,* 105 S.Ct. at 741. While the Fourth Amendment, by its terms, suggests that reasonableness is to be mea-

---

**4.** As professor Amsterdam points out:

[A subjective expectation of privacy] can neither add to, nor its absence detract from, an individual's claim to Fourth Amendment protection. If it could, the government could diminish each person's subjective expectation of privacy merely by announcing half-hourly that 1984 was being advanced by a decade and that we were all forthwith being placed under comprehensive electronic surveillance.

Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 384 (1974). *See Hud-son v. Palmer, supra,* 104 S.Ct. at 3199–3200, n. 7 ("The Court's refusal to adopt a test of 'subjective expectation' is understandable; constitutional rights are generally not defined by the subjective intent of those asserting the rights. The problems in such a standard are self-evident.") (citations omitted). Without finding that Blackburn lacked any subjective expectation of privacy after the first search, we reject the argument that its absence could deprive her of an otherwise reasonable expectation.

sured by the existence of a warrant issued upon probable cause, courts have recognized that, in limited circumstances, the absence of one or both of these elements does not make a search *per se* unreasonable. *See generally id.* at 743 (discussing exceptions). "The standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'" *Id.* at 741 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930). Here, in deciding to what standard of reasonableness prison officials strip searching visitors should be held, we must balance the official interest in maintaining security against the intrusion entailed by a strip search. That intrusion must, of course, be viewed in light of Blackburn's diminished expectation of privacy.

We have previously recognized, "as have all courts that have considered the issue, the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities." *Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir), *cert. den.*, — U.S. —, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983). As the Seventh Circuit has recently noted, body cavity searches are "'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.'" *Marybeth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir.1983) (quoting *Tinetti v. Wittke*, 479 F.Supp. 486, 491 (E.D.Wis. 1979), *aff'd without opin.* 620 F.2d 160 (7th Cir.1980)). The searches to which Ruth Blackburn was subject—which involved not only the *visual* inspection of body cavities present in the above cases, but the manual spreading of buttocks and lifting of breasts—produced exactly these feelings of humiliation in her. Her uncontroverted testimony was that she felt "very degraded", was shaking, sweating and sick to her stomach, and could hardly stand.

Against this intrusion, perhaps "the greatest personal indignity" searching officials can visit upon an individual, *Bell v. Wolfish*, 441 U.S. 520, 594, 99 S.Ct. 1861, 1903, 60 L.Ed.2d 447 (1979) (Stevens, J., dissenting), we must balance the appellants' "paramount interest in institutional security." *Hudson v. Palmer, supra*, 104 S.Ct. at 3201. The Supreme Court has admonished that the interest of prison officials in intercepting contraband and maintaining internal order must be accorded great weight, *e.g., id.; Block v. Rutherford, supra*, 104 S.Ct. at 3232–3234; *Bell v. Wolfish, supra*, 441 U.S. at 547, 99 S.Ct. at 1878; and this Court has echoed that sentiment, *e.g. Arruda v. Fair, supra*, 710 F.2d at 887; *cf. Gomes v. Fair*, 738 F.2d 517 (1st Cir.1984). And, as we have noted, this interest must not only be weighted heavily in striking the Fourth Amendment balance, but courts must, in addition, accord appropriate deference to the "professional expertise of corrections officials," *Wolfish, supra*, 441 U.S. at 548, 99 S.Ct. at 1879 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)) in selecting measures calculated to preserve the security of the facility. *See Arruda, supra*, 710 F.2d at 887. Appellants need not convince us that the Sheriff required considerable latitude in accomplishing this goal.

We reject the argument that the security needs of the Jail justified the blanket rule, however, because we believe that the record in this case shows that no unusual need for special security measures such as a strip search of all prison visitors existed, and that absent such unusual need, the Constitution normally requires a more particularized level of suspicion before individuals wishing to visit a jail may permissibly be subject to a grossly invasive body search. So basic is this constitutional norm, in fact, that appellants cannot cite, nor are we aware of, any published federal case—other than those involving *incarcerated individuals*—in which a court has approved body cavity searches of individual visitors about whom *no* particular suspicion is harbored. Certainly, this position finds no support in the federal precedents concerning strip searches of prison visitors, in which the debate has always been over

what level of suspicion is appropriate, not whether any such suspicion is required. *Hunter v. Auger, supra,* 672 F.2d at 674 (strip searches conducted unconstitutional because visitors were not target of "reasonable suspicion"); *Thorne v. Jones, supra,* 585 F.Supp. at 918 (same); *Black v. Amico, supra,* 387 F.Supp. at 91 (strip searches conducted unconstitutional because visitor was not target of "real suspicion"). Cases concerning strip searches of other classes of unincarcerated individuals who have a diminished expectation of privacy have generally taken a similar approach. *See, e.g., Security Employees v. Carey, supra,* 737 F.2d at 205, 208 (requiring "reasonable suspicion" to strip search prison guards and probable cause and warrant to conduct body cavity search of prison guards); *Marybeth G. v. City of Chicago, supra,* at 1273 (requiring "reasonable suspicion" to strip search misdemeanor arrestees confined while awaiting bail money); *United States v. Kallevig,* 534 F.2d 411, 413 (1 Cir.1976) (requiring either "real suspicion" or "mere suspicion" to strip search at border); *Doe v. Renfrow,* 631 F.2d 91, 93 (7th Cir.1980) (*per curiam* ), *cert. den.,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (requiring "reasonable cause" to believe contraband is hidden on person to strip search minor student).

 Appellants themselves concede that exceptions to the general Fourth Amendment requirement that normally some level of individual suspicion be present before a search is conducted are appropriate only when, among other things, "the privacy interests implicated by a search are minimal." Reply Brief, at 11, 12 (quoting *New Jersey v. T.L.O., supra,* 105 S.Ct. at 745, n. 8). Even in light of her diminished expectation of privacy, Black-

burn's interest in preserving the privacy of her body cavities can scarcely be thought "minimal." It is not surprising that appellants find no authority for their view, especially in light of the Fourth Amendment principle that " 'the greater the intrusion, the greater must be the reason for conducting a search,' " *United States v. Afanador,* 567 F.2d 1325, 1328 (5th Cir.1978) (quoting *United States v. Love,* 413 F.Supp. 1122, 1127 (S.D.Tex.), *aff'd,* 538 F.2d 898 (5th Cir.), *cert. den.,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 628 (1976) ); *see United States v. Sanders,* 663 F.2d 1, 3 (2d Cir.1981); *cf. Terry v. Ohio,* 392 U.S. 1, 18, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 ("a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope.")[5]

Appellants nonetheless insist that prison administrators must be allowed to implement measures they deem necessary to the security of the institution. Despite the fact that prior visitor strip search cases have always accomodated the special security needs of prisons by holding that something less than probable cause and a search warrant may properly justify strip searching a visitor, appellants argue that because the Sheriff deemed a blanket policy "necessary" to check the flow of drugs and contraband into the institution, we are thereby constrained to uphold that policy. Appellants attempt to find such a principle in *Block v. Rutherford, supra,* in which the Supreme Court recently held that the Fourteenth Amendment due process rights of pretrial detainees are not violated by a jail rule barring contact visits. In *Block,* the Court said that:

> On this record, we must conclude that the District Court simply misperceived limited scope of judicial inquiry under

**5.** The severe intrusion entailed by strip searching Blackburn was exacerbated by the manner in which the searches were carried out. The district court found, and the record shows, that the searches were conducted "in an atmosphere of marginal privacy," 586 F.Supp. at 662, and undertaken by personnel who received no training, medical or otherwise, as to how or where to conduct strip searches, *id.* Furthermore, as we have noted, the searches included manipulation

of Blackburn's breasts and spreading of her buttocks. Even courts that have upheld body cavity searches of inmates, *e.g. Bell v. Wolfish, supra,* 441 U.S. at 558, n. 39, 99 S.Ct. at 1884, n. 39, or of other individuals where a sufficient level of suspicion was present, *e.g. United States v. Klein,* 522 F.2d 296, 298 (1st Cir.1975), have emphasized that those searches included no touching at all. *Cf. United States v. Kallevig,* 534 F.2d 411 (1st Cir.1976).

*Wolfish.* When the District Court found that many factors counseled against contact visits, its inquiry should have ended. The court's further 'balancing' resulted in an impermissible substitution of its view on the proper administration of Central Jail for that of the experienced administrators of that facility.

104 S.Ct. at 3234.

Because the district court in this case found the Sheriff's strip search policy to be "clearly directed toward the goal of preserving internal security," 586 F.Supp. at 660, the appellants reason that the policy must, therefore, be found "reasonable" under the Fourth Amendment. We disagree for two reasons.

■ First, the district court in this case did not find "many factors" supporting the blanket strip search rule. Rather, while the court properly found the rule *motivated* by Snow's concern for security, it also found the rule wholly unjustified by the Jail's actual security needs, and we see no error in its finding. The evidence showed that there had been only a few—perhaps five—incidents involving visitors and contraband during the Sheriff's tenure at the Jail. Indeed, even the 1977 incident involving an inmate who obtained valium, identified by Snow as triggering the strip search rule, had never been conclusively linked to a visitor. Joseph Cannon, a prison expert with considerable experience in the field, compared the instances of visitor abuses, prior to the strip search rule, with those at other institutions and concluded that there were surprisingly few incidents, and that those that had occurred had not been serious. He therefore believed the Jail's existing security measures, which he observed in operation, to be more than adequate to address the minimal visitor contraband danger present. He also testified that in his twenty-seven years in the corrections field he had never heard of any other institution that strip searched all visitors, without any corroborating evidence that a visitor was carrying contraband. Nor had Snow himself heard of any comparable policy. Moreover, the evidence was clear not only as to the existence of other adequate security measures, *see* page 559, *supra*, but as to the fact that the Jail was equipped to offer screened, non-contact visits—an option which was never offered to Blackburn or any other visitor, in lieu of a strip search. Accordingly, the district court properly found the drastic strip search rule unnecessary and lacking any proportion at all to the "problem" it purported to solve.[6]

■ Second, like *Wolfish* before it,[7] *Block* concerned the rights of pretrial detainees. We have already discussed, as did the Court in both *Wolfish* and *Block*, the fact that "(*l*)awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Wolfish*, 441 U.S. at 546–547, 99 S.Ct. at 1877 (quoting *Price v. Johnston, supra*, 334 U.S. at 285, 68 S.Ct. at 1060); *see Block*, 104 S.Ct. at 3231–3232 & n. 8. Neither case purported to deal with the rights invoked here: those of a free citizen. We reject appellants' attempt to impute or casually transfer to free

---

6. We do not read the district court to have held, nor do we suggest, that the Sheriff was obliged to employ the least restrictive means available to safeguard institutional security. *See Block v. Rutherford, supra*, 104 S.Ct. at 3234, n. 10. But given his naked reliance on the inherent dangers of contact visits to justify a regime of routine visitor strip searches, the Sheriff was required, under basic Fourth Amendment balancing principles, to demonstrate some need for so intrusive a policy. While the fit between security requirements and privacy invasion need not be perfect, we believe that the Constitution requires that the fit be closer than it was here.

7. In *Wolfish*, the Supreme Court, while acknowledging that body cavity searches instinctively gave it the "most pause," 441 U.S. at 558, 99 S.Ct. at 1884, upheld as reasonable a jail policy requiring all inmates to expose their body cavities for visual inspection after all contact visits. In *Arruda v. Fair*, 710 F.2d 886 (1st Cir.1983), we applied *Wolfish* to uphold a prison policy requiring visual body cavity searches of maximum security inmates following visits, as well as trips to the law library and infirmary. Both concerned the Fourth Amendment rights of inmates.

citizens visiting a prison the same circumscription of rights suffered by inmates. Perhaps more than our dissenting brother, we find this distinction central to this case. Moreover, to the extent that *Block* may have, by implication, curtailed the derivative "rights" of visitors to enjoy contact visits,[8] it nonetheless did so only within the framework of the detainees' *due process* rights, where the relevant inquiry was whether the jail policy amounted to impermissible "punishment" of an individual, though lawfully incarcerated, not yet convicted of a crime. Here, we are concerned not only with a direct challenge by a visitor, but with one brought under the Fourth Amendment—a distinct constitutional provision implicating values entirely independent of those protected by the due process clause. We accordingly reject the claim that a policy requiring all visitors to be strip searched can satisfy the strictures of reasonableness solely because the Sheriff has incanted the words "institutional security." To read *Block* and other prison security cases to compel such a result would convert the interest balancing required by the Fourth Amendment into a *per se* rule upholding any search, of any person, thought "necessary" by prison officials. We believe the Constitution requires a more particularized level of suspicion to justify the humiliating and intrusive searches conducted here. While we need not define here precisely what level of individualized suspicion is required, we hold that, absent highly unusual circumstances, a rule unabashedly requiring none cannot be reconciled with the Fourth Amendment.

Appellants finally argue that, even if deemed otherwise unreasonable, the strip searches did not violate the Fourth Amendment because Blackburn consented to them. They point to several supporting facts in the record: that Blackburn signed 16 visitor slips between January—April, 1977, consenting to a search of her person and property; that officials posted a sign announcing that all visitors would be "skin searched"; that Blackburn was free to leave the Jail if she wished to forego visiting, but instead chose to submit to the searches; and that Blackburn voluntarily returned to the Jail on two occasions after the first search. Blackburn takes the position that, as a factual matter, no consent could properly be found here because, as her testimony and that of Dr. Grassian showed, circumstances in her family background caused her to feel so uniquely responsible for her siblings that she had no real "choice" but to do whatever was necessary, even if self-destructive, to see her brother—especially because he was in 23 hour a day lock up at the time.[9] In addition to this factual argument, appellee has adopted the reasoning of the district court, which rejected the consent claim because it believed that "(a)n individual whose right to visit a prison inmate is conditioned on her submission to a strip search is subjected to a 'search' within the meaning of the fourth amendment" and cannot be said to have voluntarily consented under such "'inherently coercive' circumstances." 586 F.Supp. at 661 (quoting *Palmigiano v. Travisono*, 317 F.Supp. 776, 792 (D.R.I.1970)). We need not decide whether, as a factual matter, the particular circumstances of Blackburn's background rendered any consent she gave ineffective, for we agree with the district court that, as a matter of law, Blackburn's submission to the searches under these circumstances cannot properly constitute consent because her access to the Jail was impermissibly conditioned on that submission. We do not agree, however, that Blackburn must have

---

8. In *Feeley v. Sampson*, 570 F.2d 364 (1st Cir. 1978), we held that the rights of pretrial detainees were not violated by a ban on contact visits. We recognized, however, that the availability of some form of visit, even if it involves no physical contact, implicates "communicative, as well as associational values protected by the first amendment." *Id.* at 373.

9. The evidence showed that Blackburn's brother was confined in this way not for disciplinary reasons, but because he had received a sentence at another institution and was, on that basis, administratively classified as an escape risk.

had a constitutional right to visit the institution in order to reach this result.

 Rather, it has long been settled that government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right. As the Supreme Court explained sixty years ago:

> It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guarantees embedded in the Constitution of the United States may thus be manipulated out of existence.
>
> *Frost v. Railroad Commission*, 271 U.S. 583, 593–94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1925).

Since *Frost*, which struck down a state statute conditioning the use of public highways on compliance with regulatory requirements otherwise violative of the due process clause, the doctrine of unconstitutional conditions has been applied in the context of numerous constitutional protections, *e.g., Perry v. Sindermann*, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972) (state may not condition continued public employment on relinquishment of protected speech rights); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1967) (state may not condition receipt of unemployment benefits on relinquishment of right to free exercise of religion); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (state

may not condition continued public employment on relinquishment of right to invoke Fifth Amendment privilege against self-incrimination); *id.* at 500, 87 S.Ct. at 620 (collecting cases discussing other "rights of constitutional stature whose exercise a state may not condition by the exaction of a price"), and several courts have applied it in Fourth Amendment situations analogous to the one before us, *e.g., Armstrong v. New York State Commissioner of Correction*, 545 F.Supp. 728, 731 (N.D.N.Y.1982) (state may not condition continued employment of prison guards on submission to unreasonable strip searches); *Gaioni v. Folmar*, 460 F.Supp. 10, 13 (M.D.Ala.1978) (state may not condition public access to civic center on submission to unreasonable searches).

 We find this constitutional rule dispositive of the consent issue here because Sheriff Snow expressly conditioned Blackburn's access to the Jail upon sacrifice of her right to be free of an otherwise unreasonable strip search. The Sheriff freely admits to having structured the choice to bar *any* visit, absent submission to a strip search; he does not claim to have offered those not wishing to be strip searched a non-contact visit in the facility's screened area. Irrespective of whether Blackburn had a constitutional right to visit the Jail, as the district court thought, or a mere privilege, as the appellants argue, the principle established in the cases we have cited is that the Sheriff was not free to condition the visitation opportunity on the sacrifice of Blackburn's protected Fourth Amendment rights. Nor is it any answer to say that Blackburn could have left at any time, or declined to return after the first strip search, for it is the *very choice to which she was put* that is constitutionally intolerable—and it was as intolerable the second and third times as the first.[10]

---

10. This does not, of course, mean that the government may never condition access to a privilege it controls upon submission to a search. It is perfectly clear that the government may do so, when the search it requires, unlike here, independently satisfies the Fourth Amendment requirement of reasonableness. *See, e.g., Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (upholding requirement that welfare recipients permit caseworkers to visit

██ We therefore find that, in the absence of legally cognizable consent,[11] the strip search violated Blackburn's Fourth Amendment rights.

## Qualified Immunity

 The Sheriff next argues that he should be accorded qualified immunity from liability for damages. While we agree that, as a prison administrator, the Sheriff is entitled to invoke the immunity defense, *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), we cannot agree that under the standards set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), that defense has been established here. In *Harlow*, the Court stated that:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... If the law at [the time the action occurred] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.
>
> 457 U.S. at 818, 102 S.Ct. at 2738.

Under *Harlow*, the immunity inquiry focuses not on the official's subjective belief about his conduct, but on whether the belief he held was objectively unreasonable. Thus, while the district court here found that "the evidence did not establish that Snow *knew* that his actions violated clearly established constitutional rights," 586 F.Supp. at 663, the court correctly concluded that it was the objective standard that must govern. Like the district court, we find that it was unreasonable for the Sheriff to believe that strip searching Blackburn, pursuant to his blanket search rule, did not violate her constitutional rights.

The Sheriff contends that the law of prison visitor strip searches was not clearly established in 1977 and that he could not have been expected to predict future legal developments. We are unpersuaded by this argument. It can hardly be debated that Blackburn had, in 1977, a "clearly established" Fourth Amendment right to be free of unreasonable searches. No court had intimated then, as no court has intimated today, that citizens who visit a penal institution forfeit the protections presumptively accorded them by the Bill of Rights. Indeed, the Supreme Court had made clear that no "iron curtain" separates prisons from the reach of the Constitution, *Wolf v. McDonnell*, 418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *accord Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). And the Court maintained in 1977 that inmates retained some Fourth Amendment protection while

their homes because, if properly considered "searches" at all, the visits are reasonable under the Fourth Amendment); *United States v. Bell*, 464 F.2d 667, 674–675 (2d Cir.1972) (Friendly, J., concurring) (upholding requirement that airline passengers submit to metal detector searches because such searches are reasonable under the Fourth Amendment). As Justice White explained in *See v. City of Seattle*, a case which struck down as violative of the Fourth Amendment a requirement that warehouse owners permit warrantless administrative searches of their property:

> We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product. Any constitutional challenge to such programs can only be resolved, as many have been in the past, on a case-by-case basis under the general Fourth Amendment standard of reasonableness.
>
> 387 U.S. 541, 546, 87 S.Ct. 1737, 1741, 18 L.Ed.2d 943 (1967).

*See also* W. LaFave, *Searches and Seizures*, § 8.2(K), at 677 (1978).

11. While this consent question is one of law, not fact, our approach here is consistent with governing factual standards for consent to search. *See Schneckcloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (requiring proof that consent was given freely, voluntarily and without duress, threat or coercion).

incarcerated. *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962).

The Supreme Court had also made it clear by 1977 that to justify even the intrusion on personal privacy involved in a pat frisk of outer clothing, more than an "inarticulate hunch" of wrongdoing was required, *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1967). Nor were strip searches, and the severe invasion of privacy they entailed, new to courts in 1977. For analogous cases in other contexts, *see, e.g., United States v. Kallevig*, 534 F.2d 411, 413, n. 5 (1st Cir. 1976); *United States v. Flores*, 477 F.2d 608 (1st Cir.1973), *cert. den.*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1974); *Picha v. Weiglos*, 410 F.Supp. 1214 (N.D.Ill.1976). Indeed, it was not until *1979* that the Supreme Court resolved the conflict among lower courts and held that *inmates* could constitutionally be strip searched after contact visits without any particularized suspicion of wrongdoing. *Bell v. Wolfish, supra.*

We cannot, therefore, accept the argument that the Fourth Amendment rights we have relied on in our holding today were not "clearly established" in 1977. It is true that in 1977, the exact parameters of official authority to strip search prison visitors were not yet clear—although one case had drawn the line at "real suspicion," *Black v. Amico, supra.* But the fact is that only two more visitor strip search cases have been decided since then, *Hunter v. Auger, supra; Thorne v. Maggio, supra,* and both of these cases, like *Black*, concern searches where some suspicion was present and the issue was whether that suspicion was constitutionally sufficient.[12] Any new ground broken by these cases was only to refine the issue of how much suspicion is required. Although the dissent apparently believes otherwise, we do not think it required "specific judicial articulation," *King v. Higgins*, 702 F.2d 18,

20 (1st Cir.1983), to put the Sheriff on notice that a strip search policy requiring no cause to believe that a visitor was carrying contraband violated the most fundamental principles of personal privacy and dignity for which the Fourth Amendment stands. *See id.* at 20 (although "precise bounds" of inmate's due process rights not yet clear, no immunity available where official's conduct violated even basic standards of due process.) The Sheriff consulted no legal or professional authority before imposing the search requirement and there was testimony from Blackburn's prison expert that the expert knew of no other penal institution with a blanket visitor strip search policy. These facts plainly undermine any claim that the Sheriff behaved like a "reasonable person," *B.C.R. Transport Co. v. Fontaine*, 727 F.2d 7, 10 (1st Cir.1984) (rejecting qualified immunity claim under *Harlow*); *see M.M. v. Anker*, 477 F.Supp. 837, 840 (E.D.N.Y.), *aff'd* 607 F.2d 588, 589 (2d Cir.1979) (in immunity context, evidence that there was no precedent for a strip search policy is relevant to its reasonableness). In rejecting an immunity defense in an analogous situation, the Seventh Circuit has aptly stated:

> It does not require a constitutional scholar to conclude that a nude search [of a fourteen-year-old] is an invasion of constitutional rights of some magnitude. More than that, it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law."

*Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir.1980) (*per curiam*) (quoting *Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975) ).

---

**12.** Appellants' reliance on *Security & Law Enforcement Employees v. Carey*, 737 F.2d 187 (2d Cir.1984), where the court found the defendant officials immune, is likewise misplaced. There,

the strip searches of prison employees held unconstitutional by the court were conducted only when some employee was suspected of wrongdoing.

We therefore reject Snow's immunity claim.

*County Liability*

The county argues that it should not have been found liable for any damages caused by the Sheriff's strip search rule. The district court rejected this argument and we agree that the Sheriff's acts are chargeable to the County under the circumstances presented here.

 "It is when execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government of an entity is responsible." *Monell v. Department of Social Services of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *see Cloutier v. Town of Epping,* 714 F.2d 1184, 1191 (1st Cir.1983) ("[i]n order for cities to be liable, the constitutional wrong must be committed pursuant to official policy.")[13] Here, state law expressly designates the Sheriff as the individual responsible for promulgating security policy with respect to corrections facilities. Under Mass.Gen.Laws Ann. Ch. 126, § 16 (1979), "[t]he Sheriff shall have custody and control of the jails in his county ... of the houses of correction therein, and of all prisoners committed thereto, and shall keep the same himself or by his deputy as jailer, superintendent or keeper, and shall be responsible for them." Because he appointed himself superintendent of the County's jails during his tenure as Sheriff, Snow was also given statutory authority to control all visitation, M.G.L.A. ch. 127, § 30, and to maintain order, *id.,* at ch. 127, § 33, at the Jail. Thus, there could hardly be a clearer case of county liability, for when an official "is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one 'whose edicts or acts may fairly be said to represent official policy' for which the county may be held responsible." *Fa-*

*milias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980); *accord Overbay v. Lilliman,* 572 F.Supp. 174 (W.D.Mo.1983) (Sheriff's policies are County's policies); *Shadid v. Jackson,* 521 F.Supp. 87 (E.D.Tex.1981) (same); Schnapper, *Civil Rights Litigation After Monell,* 79 Col.L.Rev. 213, 217–18 (1979).

 What the County misunderstands is that it is not because county officials *other than the Sheriff* were "involved" in the promulgation of the strip search rule, that it is liable under *Monell,* nor is it because county officials failed properly to "oversee" the Sheriff. Rather, it is liable because the Sheriff was the county official who was elected by the County's voters to act for them and to exercise the powers created by state law. Accordingly, the Sheriff's strip search policy *was* Plymouth County's policy, and the County must respond in damages for any injuries inflicted pursuant to that policy.

*Damages*

Appellants' final challenge is to the damages awarded below. They urge first that compensatory damages of $177,040 are "out of proportion" to the injuries Blackburn suffered. We agree that the damages are sizeable but, having carefully examined the evidence bearing on damages, we find that the record supports a substantial award.

 The threshold question is whether the evidence was sufficient to establish that Blackburn suffered injuries as a result of the strip searches. The district court found that circumstances in Blackburn's family background made her "extremely vulnerable to the potentially adverse consequences of an unwanted and intrusive strip search," 586 F.Supp. at 666, and that "physical and psychological problems that plaintiff experienced following the strip searches were directly caused by the strip

**13.** Unlike individual defendants, local governmental entities may not interpose the defense of immunity. *Owen v. City of Independence, Mo.,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

searches," *id.* at 666. We see no clear error in these factual findings.

■ The evidence amply demonstrated that Blackburn's background predisposed her to react severely both to the strip searches themselves and to being put to the "choice" of submitting to them or foregoing visits with her brother. Blackburn was the only member of her family who was not beaten by her alcoholic father. Psychiatrists on both sides of the case testified that, as a result of the "special treatment" she was afforded, she developed a heightened, and often self-destructive, sense of responsibility for others in the family. This sense of guilt and obligation was exacerbated by the fact that she was sexually molested by her father, even while being spared physical beatings. This abuse, according to the testimony of Blackburn's psychiatrist Dr. Grassian, caused her to develop great guilt and anxiety about sexuality and accounted for extreme self-consciousness about her own physical development. The evidence showed, for example, that despite an otherwise good academic record in high school, she failed physical education because she refused to shower in the presence of others. Likewise, she avoided any physical contact with males during her adolescence and, in fact, had, at age 18, begun her first sexual relationship shortly before she was first strip searched.

The evidence was far more sharply divided on the question whether the strip searches did, in fact, inflict substantial harm on appellee. Dr. Grassian considered the searches directly responsible for a number of serious problems which beset Blackburn after April, 1977. He testified, and her own testimony corroborated, that she developed a phobia about sex after the searches which not only caused her to break off her first sexual relationship, but later manifested itself as a severe sexual dysfunction. That dysfunction, which rendered her unable to have sexual relations without experiencing muscle spasms, rigidity and pain, apparently persisted through Blackburn's subsequent marriage and had not abated at the time of trial. Grassian further indicated that he traced symptoms of post traumatic stress syndrome to the searches. These symptoms included feelings of guilt and depression, recurring nightmares in which Blackburn imagined a jury laughing at her naked body, and difficulty sleeping. Dr. Grassian linked these symptoms to Blackburn's ultimately attempting suicide and dropping out of college. Appellants' psychiatric expert, Dr. Norman Zinberg, disagreed. He, too, believed that the strip searches were extremely uncomfortable for her, and painfully forced her to choose between her own best interests and those of her brother. But Dr. Zinberg did not think the searches were "devastating" to her, nor did he causally link the searches to the problems she later encountered. Indeed, he believed that Blackburn's sexual abilities "improved" after the searches.

The court, as fact finder, was thus confronted with two radically different assessments of Blackburn's reaction to the searches. In resolving just such a conflict, "[w]e rely heavily on the judgment of the trial court, who has had the benefit of hearing all of the evidence and observing the demeanor of the witnesses." *Clark v. Taylor,* 710 F.2d 4, 13 (1st Cir.1983). Having had that benefit, and having heard Blackburn tell her own story, the court credited Dr. Grassian's testimony, and found that the searches directly caused Blackburn the injuries enumerated above. Although appellants argue to us that those causal links were not proven, and the evidence is divided on several points, we cannot say that the court's findings were clearly erroneous.

"[O]nce the fact of damage is established, the trial judge has much latitude in fixing the amount of damages." *Rivera Monrales v. Benitez de Rexach,* 541 F.2d 882, 886 (1st Cir.1976) (citation omitted). Absent an abuse of discretion, *T & S Service Associates v. Crenson,* 666 F.2d 722, 728 (1st Cir.1981); *Brule v. Southworth,* 611 F.2d 406, 411 (1st Cir.1979), we will not ordinarily disturb the amount awarded.

Damage awards in actions under § 1983 should "provide fair compensation for injuries caused by the deprivation of rights." *Carey v. Piphus,* 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978). Our cases hold that civil rights plaintiffs may recover for mental distress, *see Clark v. Taylor, supra,* 710 F.2d at 14; *Brule v. Southworth, supra,* 611 F.2d at 411. While the mental, as well as physical suffering Blackburn experienced may be difficult to quantify, *see Clark v. Taylor, supra,* at 13–14, we are satisfied by the court's detailed factual findings that the damages awarded, including $27,040 for future medical costs, corresponded to actual and serious injuries—some of which persisted through trial. We note, as well, that the size of award need not have depended wholly on the idiosyncrasies of Blackburn's personal history and her predisposition to be damaged by strip searches conducted under the circumstances present here—although the Sheriff surely took his proverbial victim as he found her. Other courts have approved large awards for even a single strip search, *see, e.g., Marybeth G. v. City of Chicago, supra,* 723 F.2d at 1275–76 (upholding award of $60,000 to pretrial detainee for one strip search), doubtless in recognition of the grossly intrusive nature of the practice. Moreover, where, as here, a prison official makes strip searches a matter of routine practice, and therefore compels all who wish to enter the institution to submit *repeatedly* to this grievous invasion, correspondingly higher damage awards are appropriate. *See Hunter v. Auger, supra,* 672 F.2d at 677.

Appellants also claim that the court's award of prejudgment interest was improper. We have held that, in cases brought under § 1983, an award of prejudgment interest, though not mandatory, may be made if "necessary to compensate [the plaintiff] fully." *Furtado v. Bishop,* 604 F.2d 80, 97 (1st Cir.), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1979). The decision is committed to the fact finder's discretion. *Heritage Homes of Attleboro v. Seekonk Water District,* 648 F.2d 761, 764 (1st Cir.), *cert. denied,*

454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Here, the trial court made a finding that such an award was necessary. 588 F.Supp. 1386, 1389. But the court did not detail the bases of its findings.

We see a risk in this case that at least a portion of the award of prejudgment interest may have been improper. One would normally expect any of an amount awarded that is aimed at compensating for future pain, suffering, or emotional loss to be included in the lump sum award itself without additional interest. Certainly any of the award that was designed to compensate for future medical payments should have been included in the fixed (pre-interest) sum in an amount that, if invested, would grow to equal the fees likely charged at future times. *Cf. Lakin v. Marr,* 732 F.2d 233, 238 (1st Cir.1984). Moreover, the award itself was large and it was based upon an intangible loss—the type of loss more usually reflected in the (pre-interest) lump sum than, say, a past "liquidated" loss of fixed amount, to which interest (representing loss of use of the sum) is then appropriately added to make the plaintiff whole.

Under these circumstances, we believe that more specific findings on the need for prejudgment interest, including a finding as to the date upon which any award of interest should properly commence, are necessary and the case must be remanded to obtain them. Therefore, *the case is affirmed in part, and vacated and remanded in part, for proceedings consistent with this opinion.*

BAILEY ALDRICH, Senior Circuit Judge, dissenting.

Before examining the bricks of which this ultimate structure was built, I note its totality: $328,120, being $177,040 in damages and $151,080 in prejudgment interest, because plaintiff was three times, in April and May 1977, subjected to a strip search in connection with visiting her brother at a Massachusetts prison. Although there was no probing, or even touching of the private

bodily orifices, the court (I use the term "court" throughout as meaning this court, as distinguished from the district court) characterizes the "intrusion [as] perhaps 'the greatest personal indignity' searching officials can visit upon an individual." It finds damages "exacerbated" because of the "marginal privacy," although the searches were conducted in a small room, by a single matron, with no one else present. Damages were also exacerbated because the matron had received no medical training, although there was no evidence of medical injury. I start, however, with plaintiff's Fourth Amendment claim, and Sheriff Snow's claim to qualified immunity.

The court acknowledges that "prison administrators should be accorded wide-ranging deference," and that assessment of these claims involves a "delicate task," and cites the right opinions. Not included, however, in its generalizations, and, I suggest, adequately in its thinking, is the following from *Block v. Rutherford*, —— U.S. ——, 104 S.Ct. 3227 at 3233–34, 82 L.Ed.2d 438 (1984). "We can take judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." "Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers." Instead, the court says, "[W]e believe that the record in this case shows that no unusual need for special security measures such as strip search of all prison visitors existed."

With respect to reasonableness, defendant testified,

"[Plymouth is] basically supposedly a minimum security institution; however, the way we were operating the past several years, with the backlog in Walpole and things, we were holding—at one point I had 26 or 27 inmates out of Walpole, and I had another 25 inmates, federal inmates.

. . . . .

"So basically, it was a minimum institution with maximum security people in it.... The majority of them were there for drug related—mostly—some of them were direct drug sentences or waiting trial for drugs, or the majority of them, probably, breaking and entering or different things to support drug habits." [T]he thing that causes the most problem is drugs and the control of them.... [When I returned from Florida in early April, 1977] I had reports, verbal reports from different officers that *things were getting out of hand in the institution. There were several inmates right after visits were high."* (Emphasis supplied.)

Asked what he ordered done, he answered,

"I questioned about the search procedures that was going on, and I found out that they were not strip searching visitors. So I ordered it reinstituted."

For not requiring individual suspicion, defendant testified,

"[W]e had found drugs in babies' diapers before and we have found them since . . ."

Reports also showed drugs found in sanitary napkins and underpants.

None of this testimony was contradicted, or affirmatively rejected. I do not know what the court means by "the district court in this case did not find 'many factors' supporting the blanket strip search rule." It is true that the district court devoted only a footnote to defendant's reasons, neglecting specific testimony, and merely reciting that the Incident Reports "indicates that visitors were involved in very few drug or weapon related incidents." The court gives more detail, referring to defendant's testimony of "five incidents involving visitors" while the searches were suspended, and characterizes this as "only a few."

Drugs in prisons can be serious, and defendant's testimony revealed he had special problems. It cannot be said that drugs could inescapably be found in some other manner, for they were not. Is the court to say defendant's conduct was "capricious [and] not justified by considerations of jail

security," *Feeley v. Sampson*, 570 F.2d 364, 372 (1st Cir.1978), because only five cases got by in spite of body searches of inmates? In *Rutherford v. Block*, 104 S.Ct. at 3233, the court said, "In *Wolfish* [*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)], we sustained against a Fourth Amendment challenge the practice of conducting routine body cavity searches [of inmates] following contact visits, even though there had been only one reported attempt to smuggle contraband into the facility in a body cavity."

Finally, the court speaks of plaintiff as a "free person," and says there is no case approving strip searches of "[non-] *incarcerated individuals*" (emphasis in original). This is to confuse person and place. How different was plaintiff from the detainees in *Wolfish*, who, also, had been convicted of nothing? The point is, plaintiff *was* inside a prison, and "smuggling [is] a byproduct of contact visits." *Rutherford*, 104 S.Ct. at 3233.

While, at the very least, I question the court's facility in determining unconstitutionality, I will not pursue this further because it is only secondary to what I regard as the deep, and conclusive error in this case, the short shrift accorded defendant's claim of qualified immunity. It may be captious to note that the court's originating summary begins, "At issue in this case is whether the federal Constitution permits a correctional institution to require that all men, women and children wishing to visit inmates at the institution submit to a strip search before doing so," and concludes "Because we find that the strip search violated Blackburn's Fourth Amendment rights, we affirm as to liability." However, it is only commencing at page 569 that the court devotes four pages to the

question whether conduct today found unconstitutionally excessive was clearly established to be such in 1977.[1] The court's approach almost seems to be that excessiveness, and objective obviousness, are one and the same. They are not, and starting from the position that defendant's security decisions are entitled to "wide-ranging deference," unless he should have known them wrong, I find the four pages singularly unpersuasive.

Apart from generalizations, the court's chief reliance with respect to the law in 1977 are three "analogous" cases: our decisions in *Kallevig* and *Flores*, involving border searches and *Picha v. Weiglos*, a school principal case.[2] In analogizing border searches where there was no suspicion, the court neglects two matters. The first is that the extent of permissible intrusion is to be measured by the need, and there is a basic difference in need between a search simply to discover whether the individual has committed a crime and one where the objective is the protection of the public, such as prison security. It is axiomatic, for example, that there is far more right to search embarking airplane passengers than those who are debouching. Cf. *United States v. Wehrli*, 637 F.2d 408 (5th Cir. 1981), cert. denied, 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958; *Singleton v. Commissioner of Internal Revenue*, 606 F.2d 50 (3d Cir.1979). Second, it is not true that there was no suspicion here; the suspicion was in the situation. These factors were what moved the Court in *Bell v. Wolfish* to permit routine body cavity searches of detainees, after visits, without individual suspicion. They are present to a degree here, and were not present in the border searches at all. If the court feels they

---

1. I, of course, agree with the court that subjective reasonableness—given, as the district court found, that defendant acted in good faith—is not the test. At the same time, the court seems inconsistent in faulting defendant for not taking legal advice. Under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), a defendant stands or falls on whether the law was "clearly established."

2. *Weiglos* is peculiarly unhelpful. In addition to being a mere district court case from another circuit, the opinion goes off on the ground that the search was participated in by a warrantless police officer, the court indicating that its decision might be different had it been the school principal searching on his own. Defendant's position here was akin to the principal in charge of the school, not to the police officer. See 410 F.Supp. at 1220.

were not present enough, this still does not make those cases analogous, let alone clearly expositional.

The cases in point, apart from *Wolfish*, which is anything but helpful to the court, are the subsequent visitor's cases of *Hunter v. Auger*, 672 F.2d 668 (8th Cir.1982), and *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187 (2d Cir. 1984), both decided long after 1977. *Hunter*, which was pre-*Harlow*, gave no thought to qualified immunity. Interestingly enough, while the court affirmed the injunction, as a sort of fire-side immunity it reduced the district court's damage findings to nominal, although I would have thought that a strip search would justify emotional damage without specific proof. In *Carey* a divided court held that routine strip searches of unsuspected prison guards was excessive, but the court unanimously held the law had not been clearly established. Defendants "operated in an area in which the law was not charted clearly." 737 F.2d, at 211. I do not understand the court's finding clarity by distinguishing this case on the ground that "some employee was suspected of wrongdoing." In the case at bar, as in the routine *Wolfish* searches, some visitors were suspected of wrongdoing.

The simple fact is that the court cites no even recent case denying qualified immunity without special circumstances; viz., *King v. Higgins*, and *M.M. v. Anker*, violation of regulation, and hence constructive bad faith; *B.C.R. Transport Co. v. Fontaine*, actual bad faith. With due respect, particularly having in mind *Security, etc. Employees v. Carey*,[3] this seems a sorry demonstration of clear establishment in 1977.

There is a strong social purpose behind *Harlow v. Fitzgerald*, perhaps nowhere more important than in the dangerous area of prison safety, and I may be pardoned for referring back to the fact that this defendant was in charge of a low security prison with temporary guests from a maximum security institution. Offended by visual body cavity searches; seemingly regarding a visitor inside a prison as fundamentally different from an "incarcerated individual" (though nothing is clearer than the fact that prison searches are based upon present danger, not punishment, cf. *Block v. Rutherford*, 104 S.Ct. at 3232–34 (1984) ), I believe that in finding the law "clearly established" and defendant's conduct "previously identified as unlawful," *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, the court grossly violates *Harlow*, both its letter and its spirit.

On the assumption that I am nevertheless wrong, I turn to damages. Except for damages I believe avoidable, I do not intend to dwell on the gross award, but I do remark that for the court to point to the $60,000 verdict in *Marybeth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983), and quote the court's description of plaintiff's body cavity search as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission" is somewhat wide of the mark. *Marybeth G.* was everything which this case is not. Rather than being alone with the matron, plaintiff there, an alleged misdemeanant awaiting bail, was strip-searched within the view of two male officers and a group of prostitutes who "jeered" at her. The audience was not only unnecessary, but inexcusable, and would surely cause maximum humiliation and embarrassment. Further, this was clearly an invasion of privacy in aid of prosecution. Here the court expressly found that defendant's purpose was security.

*Marybeth G.* is inapposite for a more important reason. There the plaintiff had no alternative. Here, at least presumptively, plaintiff had a choice.[4] This raises the

---

**3.** Cf. *United States v. Leon*, — U.S. —, 104 S.Ct. 3405, 3423, 82 L.Ed.2d 677 (1984), magistrate's decision is reasonable when issue is "sufficient to create disagreement among thoughtful and competent judges."

**4.** The court, properly, does not resolve plaintiff's claim, disputed by defendant and unresolved below, that her "family background" left her "no real 'choice' but to do whatever was

question of avoidable damages. The district court, however, based on its holding that plaintiff had a "right to visit" concluded, "The mere fact that she submits to the search does not render it 'voluntary' where her consent is given in 'inherently coercive circumstances.' *See Palmigiano v. Travisono,* 317 F.Supp. 776, 792 (D.R.I.1970)." The court agrees, but adds that a "right" to visit was unnecessary. "[W]hether ... a constitutional right ... or a mere privilege, ... the Sheriff was not free to condition the visitation opportunity on the sacrifice of Blackburn's protected Fourth Amendment rights." "Nor is it any answer to say that Blackburn could have left at any time, or declined to return after the first strip search, for it is the *very choice to which she was put* that is constitutionally intolerable—and it was as intolerable the second and third times as the first." (Emphasis in original.)

This is an entirely novel concept. The court cites nothing suggesting that because constitutional rights are involved recovery is any broader than for violations of other rights; that a section 1983 plaintiff can disregard ordinary principles, such as assumption of the risk, and *volenta non fit injuria.* Rather section 1983 actions are to be guided by analagous common law tort principles, except in unusual cases where these would not provide a remedy. See *Carey v. Piphus,* 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978). Thus in *Whirl v. Kern,* 407 F.2d 781 (5th Cir.1969), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177, a 1983 plaintiff sued for false imprisonment. The defendant defended, in part, upon plaintiff's failure to ask for counsel, who would have obtained his early release. The court said that one who "intentionally or heedlessly failed to protect his own interests" was chargeable with the consequences, but held that plaintiff was uneducated and uninformed and did not realize an attorney could have obtained a release. Cf. *Williams v. Albemarle City Board of Education,* 485 F.2d 232, 233 and n. 1 (4th Cir.1973) (duty to mitigate damages).

Plaintiff was not a helpless individual. Even if one were to accept her claim that she felt compelled to do everything necessary to see her brother, she failed to suggest any reason why she could not have told defendant of her special problems and asked for special treatment. She was not helpless in jail, but an educated woman, in college, on the dean's list, and there was no indication that she was afraid to speak up.[5] In fact, in high school she had sought and obtained exemption from the compulsory physical examination on the very ground of her hypersensitivity. Perhaps defendant would have refused,[6] but to be able to recover substantial damages without at least attempting to avoid them (complaining to the matron was certainly not the way) or to notify a prospective defendant in advance, is to me highly offensive. There is a basic injustice in silently persisting to incur, as plaintiff testified, extraordinary injuries, and then seeking extraordinary recovery. Section 1983 should not change this. If the court is correct that defendant, though in subjective good faith, was inex-

necessary, even if self-destructive, to see her brother."

5. I think I should comment on the court's footnote 2 regarding plaintiff's encounter with defendant when out of bounds on his lawn. It is true that the court "made no finding that Blackburn made an obscene gesture." That is no answer to an offered exhibit, an official Incident Report by a guard, who heard plaintiff "yelling obscenities to the Sheriff, she raised her right hand, giving 'the finger' towards the Sheriff." The obscenities were orally testified to as calling defendant "a fat f...g pig." There was no contradiction. If the matter is important enough for this court to mention it, and I think

it is important, it is not to be dismissed on the ground that the district court failed in its duty (F.R.Civ.P. 52(a) ) to make a finding.

6. Defendant was no hardnosed individual with regard to visitors. He testified, "[O]ne of the first things I did was to change the visiting hours. Visits used to be just Saturday and Sunday afternoons. I changed them to every evening and Saturday and Sunday afternoons [and] added holiday afternoons." There was no contradiction. It is not to be assumed that he would have refused plaintiff, had he been informed, of her special need for non-contact facilities.

cusably excessive in his concern about drugs, and insufficiently concerned about plaintiff, I believe that, when unwarned, he should, at the most, be held for no more than what was reasonably foreseeable. As the court decides this case, defendant is down for the count.

It seems almost hypercritical of me to continue to complain, but neither am I happy about prejudgment interest. In *Furtado v. Bishop*, 604 F.2d 80 (1st Cir.1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 we held[7] that the Massachusetts statute imposing prejudgment interest from the date of the complaint was not applicable to a civil rights action for unliquidated damages—there a physical beating. We rejected the Massachusetts statute and vacated the court's award. We did recognize that, in the factfinder's discretion, it might sometimes be necessary to award such interest in order fully to compensate the plaintiff. In its original findings here, and in its order for judgment, the district court said nothing about interest. Apparently applying the Massachusetts statute, the clerk included in the judgment, "Prejudgment interest at the rate of 12% per year: $151,080." Both parties filed post judgment motions; defendants' to strike the award of interest, plaintiff's, described by the court as one "to modify its opinion to make a finding in support of its award." To these the court replied, citing *Furtado*, that it had "awarded prejudgment interest because it was necessary to compensate plaintiff fully for the injuries she had suffered." It made no supporting findings.

The court agrees that subsidiary findings were necessary (F.R.Civ.P. 52(a) ), and says that "at least a portion of the award ... may have been improper." This is a quite inadequate concession. In the first place, the judgment included $27,040, a calculated total of future medical bills. There could be no occasion for adding seven years back interest at 12% ($23,000) to "fully compensate" plaintiff for expenses not yet incurred. Second, absent some contractual,

or quasi-contractual setting of a date, interest on an unliquidated sum does not commence until there is a demand, normally the filing of the complaint. The original complaint here sought only an injunction; it was not until sixteen months later that plaintiff amended to seek damages—$11,000 actual; $20,000 punitive. There is no justification at common law, or even under the Massachusetts statute, for awarding interest for those sixteen months.

More basically, however, I believe the court's suggestion of dividing the intangible award between past and future, and awarding interest on the former, is supported by neither authority nor logic. Plaintiff's damages for past suffering did not all date back seven years, but, as plaintiffs' counsel in such cases are always at pains to emphasize, are a day to day continuum. To award interest, from the beginning, on the accumulation to date makes no sense. *Furtado's* "discretion" did not invoke new principles. I find this a peculiarly improper time to devise an exception to the general rule that, with respect to intangible, continuous damages, prejudgment interest is not to be awarded at all. See discussion in *Cochran v. Boston*, 211 Mass. 171, 172–73, 97 N.E. 1100 (1912); McCormick on Damages §§ 54–57.

I would vacate the judgment and order the complaint dismissed. If this is not correct, I would remand for a finding of unavoidable damages, not to exceed those reasonably foreseeable, without interest.

---

7. The "we" is editorial; I was the judge reversed, and quite correctly so.